752 P.2d 605

**Capt. A. LEPPALUOTO, Plaintiff–Appellant,**

v.

**WARM SPRINGS HOLLOW HOME-OWNERS ASSOCIATION, INC., a non-profit corporation, Defendant–Respondent.**

**No. 16704.**

Supreme Court of Idaho.

March 15, 1988.

Lindsay, Hart, Neil & Weigler, Boise, for plaintiff-appellant. Steven R. Ormiston argued.

Davison, Copple, Copple & Copple, Boise, for defendant-respondent. Terry C. Copple argued.

McFADDEN, Justice, pro tem. (Ret.).

This is an appeal from the district court's affirmation of summary judgment appealed from a magistrate court's decision awarding defendant-respondent, Warm Springs Hollow Homeowners Association, Inc., (hereinafter Association) delinquent condominium fee assessments and attorney fees, and denying plaintiff-appellant Capt. A.

Leppaluoto (hereinafter appellant) attorney fees. We affirm. The facts are as follows.

In 1977 Commercial Structures, Inc., negotiated four construction loans from Idaho First National Bank to develop a condominium project called Warm Springs Hollow. To secure the loans, four separate deeds of trust encumbering the entire project were recorded in December 1977 and February 1978. In April 1978, Commercial Structures Inc. recorded the Covenants, Conditions, Restrictions and Easements (hereinafter covenant agreement), with respect to the project. With the filing of this covenant agreement, the Association was created. Soon after, Commercial Structures, Inc. experienced financial difficulty, defaulted on the construction loan and filed a petition for declaration of bankruptcy. Subsequently, in 1980 the Bank foreclosed on the deeds of trust and obtained title of all unsold lots through a foreclosure sale. The Bank obtained title to twenty-six lots on which were partially completed townhouses, twenty-four undeveloped lots and all of the Association's common areas. The Bank's next course of action was to began negotiating with the officers and board of directors of the Association to make Warm Springs Hollow a viable project. It also took on the financial responsibility of maintaining the common areas.

In 1982, the Association requested the Bank to pay full assessments pursuant to the 1978 covenant agreement on the lots it owned. The Bank refused, contending, among other things, that the foreclosure against the project pursuant to the deeds of trust extinguished the covenant agreement on all fifty lots acquired by it, and in any event, it had expended substantial sums of money to repair and maintain the common area and was entitled to a full allowable offset against any alleged assessment claim.

Eventually, the Bank and the Association agreed to a compromise requiring the Bank to pay $17,000 in full settlement of any alleged assessments on the partially developed lots owned by the Bank. However, negotiations continued with respect to the assessments on the undeveloped lots.

In 1981, appellant purchased his undeveloped lot subsequent to both the recordation of the deeds of trust to the Bank and the covenant agreement. During September 1982, he, through his attorney, wrote the Association demanding it diligently attempt to collect the assessments from the Bank relating to the 24 undeveloped lots. In the event the Association refused he stated he would bring an action against the Bank on behalf of the Association to collect those assessments. The Association decided not to bring the action against the Bank but to continue negotiations. The reasons advanced by the Association for this course of action varied, but primarily revolved around two issues: *i.e.*, first, there was uncertainty as to whether or not the Bank was liable for assessments because its title, springing from the original deeds of trust, was prior to and superior to the covenant agreement; second, even assuming the Bank was subject to the covenant agreement, there remained an issue of whether or not any offset asserted by the Bank for maintenance expenditures was greater than the claimed assessments due.

In January 1983, appellant, purportedly on behalf of the Association members brought an action against the Association seeking to require it to take reasonable steps to collect the assessments allegedly owed by the Bank. However, the Association, acting through the Board of Directors, decided to defend against that action. During February of 1983, the Association learned that the Bank was negotiating with a developer to sell the undeveloped lots. After obtaining this information, the Association decided to bring an action against the Bank on the claimed assessment. The Association's attorney was unavailable to bring the action and the appellant's attorney, Rudy Barchas, was requested to represent the Association. Appellant consented to this and Barchas initiated the action describing the Bank's undeveloped lots. A copy of the complaint and lis pendens was delivered to the proposed purchaser. No further action was taken by Mr. Barchas on behalf of the Association.

This action led to additional negotiations between the Bank and the Association which, in July of 1983, resulted in a settlement agreement. The highlights of the settlement required the Bank to:

1. commence paying assessments on the undeveloped lots in the amount of $35.00 per month beginning August 1, 1985;
2. include the restrictions contained in the covenant agreement in all subsequent sales of the lots;
3. pay all costs for repair and upkeep on existing improvements in the common area;
4. pay $17,400 to the Association for prior assessments.

A joint meeting of the stockholders and directors of the Association was held to review and discuss the terms of the settlement agreement as well as to obtain the 90% approval of all lot owners as required by the covenant agreement. The settlement agreement received a unanimous vote of approval by the homeowners and directors who attended this special meeting. Appellant did not appear at the meeting nor did he file any written objections. However, he refused to pay any of his subsequent assessments on his lot.

Appellant fell in arrears on his assessments, and therefore, in July 1986, the Association filed an original claim in the small claims court to collect the delinquent assessments. Appellant thereafter filed a complaint in the magistrate division of the district court seeking a reduction in his current assessments. The appellant contends that because he purchased his lot after the adoption of the covenant agreement, which provided that all of the lot owners were to pay uniform assessments, that the Bank should not be allowed to pay less than the rest of the homeowners. The July 1983 settlement agreement allowed the Bank to pay less than the total amount that would have been paid if they had paid the regular assessment fee. The appellant alleges that the July 1983 settlement was in fact a retroactive amendment of the covenant agreement which, therefore, is invalid because it was not made with the unanimous consent of all property owners. It is the appellant's position that he should not have to pay any more than the Bank had to pay for past due assessments. The appellant also alleges that the Association was unjustly enriched by the use of his attorney in that he had paid the attorney to prepare for the litigation and the Association got the benefit of the attorney's preparation. These actions were consolidated for hearing in the magistrate court.

Each party moved for summary judgment in its favor relying on affidavits, and depositions with attached exhibits. The magistrate court granted the Association's summary judgment motion rendering judgment for past due assessments, interest, cost and attorney fees. This summary judgment was appealed by appellant to the district court which affirmed the magistrate, and this appeal followed.

The case was before the trial court on cross-motions for summary judgment. Generally, summary judgment should only be granted when there is no issue of genuine fact. I.R.C.P. 56(c). Here, the parties moved for summary judgment based upon the same evidentiary facts and the same issues and theories, and thus, they have effectively stipulated that there is no genuine issue of material fact. *Riverside Development Co. v. Ritchie*, 103 Idaho 515, 650 P.2d 657 (1982); *Kromrei v. AID Insurance Co.*, 110 Idaho 549, 716 P.2d 1321 (1986).

The appeal to this Court presents four issues: (1) Is the settlement agreement violative of the covenant agreement, and if so, is the appellant relieved from paying his assessments? (2) Is the appellant entitled to reimbursement from the Association for attorney fees under the theory of unjust enrichment? (3) Is the Association entitled to a reasonable award of costs and attorney fees below? (4) Is the Association entitled to reasonable attorney fees on appeal?

The appellant does not dispute the Association's right to collect assessments. However he points to art. IV, § 6 of the Association's Articles of Incorporation which states: "§ 6. Uniform Rate of As-

**6**

sessment. Both annual and special assessments must be fixed in a uniform rate for all lots...." He argues that the settlement agreement between the Association and the Bank allows the Bank to pay monthly assessments lower than all of the other lot owners, and therefore violates art. IV, § 6. We disagree.

Initially the Association demanded that the Bank pay the $35 monthly assessment fee on the lots it owned in the subdivision, and give the entire common area improvements to the Association without charge. The Bank refused asserting among other things: (1) the foreclosure under the deeds of trust resulted in a title superior to the covenant agreement on the lots it acquired; and (2) it was in the process of expending substantial sums to repair and maintain the common areas which was the financial obligation of the Association pursuant to the covenant agreement, and thus the Bank was entitled to a full equitable offset against any alleged assessments. The Association's attorney advised the Association that a negotiated settlement was a better course of action than a long costly lawsuit. The Board of Directors took the advice and eventually reached the mutual agreement with the Bank. The issue is whether this agreement violates the uniform assessment section of the covenant agreement. The Association contends that even if the covenant agreement is violated, it is protected by the business judgment rule.

> This rule immunizes management from liability in corporate transaction undertaken within both power of corporation and authority of management where there is reasonable basis to indicate that transaction was made in good faith.

> *Blacks Law Dictionary* 181 (rev. 5th ed. 1979). Cf. [*McLeod v. Lewis–Clark Hotel Co.*] *McCloud v. Lewis*, 66 Idaho 584, 164 P.2d 195 (1945); *Steelman v. Mallory*, 110 Idaho 510, 716 P.2d 1282 (1986).

There is nothing in the record to indicate that the Association acted in anything other than a reasonable and prudent manner in trying to resolve the dispute with the Bank about the assessments of the lots.

The Bank raised the issue of whether the covenants could be applied to it. The Association determined that the Bank had a legitimate claim and the best course of action was to negotiate. This resulted, among other things, in a cash payment in excess of $17,000 paid to the Association for the delinquent assessments on the undeveloped lots. The record reflects that the directors of the Association were acting within the powers of the corporation and exercised their honest business judgment in attempting to settle the dispute. Therefore, the appellant's position that the settlement agreement was a retroactive assessment is without merit. The decision of the trial court requiring the appellant to pay delinquent assessments is upheld.

■ The appellant further contends he should be entitled to reimbursement of attorney fees based on the theory of unjust enrichment. He contends the Association, when learning of the Bank's negotiation to sell the undeveloped lots, needed an attorney familiar with the specific facts and issues involved. Because its attorney was unavailable the Association contacted the appellant and requested the use of his attorney, Rudy Barchas, who was knowledgeable of the facts. The appellant agreed and the Association used Barchas to bring an action against the Bank. Barchas was compensated by the Association for his time spent in that action recording the lis pendens and delivering copies to the proposed purchaser.

However appellant asserts argues that he should be reimbursed for Barchas' fees paid by him relating to his attorney's time for familiarizing himself with the facts, issues and law surrounding the controversy. Otherwise, appellant argues, the Association received a benefit—an attorney with knowledge of the facts of applicable law—without paying for it. We disagree.

The essence of the quasi-contractual theory of unjust enrichment is that the defendant has received a benefit which would be inequitable to retain at least without compensating the plaintiff to the extent that retention is unjust. *Hertz v. Fiscus*, 98 Idaho 456, 567 P.2d 1 (1977). Here, the

appellant incurred the legal expenses paid to Barchas on his own behalf without the approval, consent, or ratification of the Association.

If appellant's theory were applied in all cases where a party retained an experienced attorney, the party who had previously retained the attorney would be entitled to some compensation from the second client. Here, the Association requested the appellant's permission to hire Mr. Barchas which the appellant freely gave. The appellant did not at this time request any compensation from the Association for Mr. Barchas' expertise. Mr. Barchas was paid by the Association for the services he performed. There is no basis for unjust enrichment simply because Mr. Barchas, formerly the appellant's attorney, was hired to do work for the Association.

Finally, the Association is entitled to reasonable attorney fees. Art. IV, § 1 of the covenant agreement states "each such assessment together with interest, costs and reasonable attorney fees, shall be the personal obligation of the person who is the owner of such property at the time when the assessment fell due." The appellant does not dispute this section of the covenant agreement, but he argues that it does not apply in this case. We disagree, and thus we affirm the ruling of the magistrate court and the district court that the Association is entitled to an award of reasonable attorney fees for collecting the delinquent assessments. Further, by reason of that provision the Association is entitled to reasonable attorney fees on appeal.

Costs to respondent.

Attorney fees to respondent.

SHEPARD, C.J., and BAKES and HUNTLEY, JJ., concur.

BISTLINE, Justice, dissenting.

The opinions issued in this case will not be monuments of Idaho jurisprudence. No great law is being made this day. Unfortunately, it could be otherwise if the Court's membership was more in tune with principles of fair-play and justice—which are the main ingredients which cause courts sitting in equity to do equity.

Synopsizing the history portrayed in the majority opinion, here is the first half of the story. The plaintiff in this action became the owner of an undeveloped lot in Warm Springs Hollow. The Idaho First National Bank at that time owned (by foreclosure on the developer) 24 undeveloped lots and all of the Warm Springs Hollow Homeowners Association's common areas. The Bank denied the Association's request to pay the assessments on its 24 undeveloped lots, although it had paid, and the Association accepted, $17,000 in full settlement on its partially developed lots.

The plaintiff in this action was of the firm view that the bank should be brought to heel. His attempts to convince the Association officialdom to pursue the Bank were turned away. The Association officialdom gave two reasons for their reluctance, neither of which consisted of any admission that it might not be politic to sue a bank. He went so far in his efforts as to commence an action against the Association officialdom, the purpose of which was to compel it to take action, bringing his action on behalf of himself and other members.

The Association, while it would not take on the bank, was willing to fight off the plaintiff. The plaintiff had hired a lawyer, and was well-advised in the premises as to the likelihood of successful litigation against the Bank.

At this juncture, that of standing off the plaintiff in his quest to obtain for the Association that which the Bank withheld from it, a strange wind blew in with good news for the Association. Guess what? The Bank was believed about ready to sell its undeveloped lots to a promoter or developer. What an opportunity to use coercive measures against the bank! The Association, now fully responsive to the validity of the plaintiff's legal contentions, did not hesitate to decide that, after all, legal action against the Bank was not such an awful course to follow. Anyone knows that the filing of a lawsuit together with

the filing of a *lis pendens* can often produce remarkably swift results.

Alas, the Association's attorney was not available to get an action filed right now. No other attorney being at hand who was knowledgable concerning the filing of the exact action against the Bank, the Association did not hesitate to ask its erstwhile antagonist, plaintiff, for the use of his knowledgable attorney's services. Here was an attorney who knew the territory, and could go into action immediately. One small, but not insignificant problem, he was on retainer with plaintiff.

Was plaintiff a dog-in-the-manger? Not at all. He quickly gave his consent to his attorney now taking on the vulnerable Bank on behalf of an avaricious association which had the smell of bank money in its nostrils. The end of the first part of the story. Just great for the Association. And, what is more, the plaintiff's view that the Bank had all the time been liable were fully vindicated. If not so, then the Association was guilty of extracting money from the Bank to which it was not entitled.

Meanwhile, the plaintiff was not rewarded one whit, and fell onto hard times—"arrears in his assessments." This would not do at all, and the Association did not hesitate to take him into court, thereby turning him into a man who will pay his assessments, or else.

Not taking too kindly at being kicked around thusly, the plaintiff decided that enough is enough, and came after the Association. Among other claims, he contended that "the Association was unjustly enriched by the use of his attorney in that he had paid the attorney to prepare for the litigation and the Association got the benefit of the (his) attorney's preparation." (Majority Op. p. 5, 752 P.2d p. 607).

The majority opinion well points out the quick benefit which flowed to the Association from the filing of a lawsuit and a *lis pendens*. To the credit of the majority, it does pay rote lip service to the theory of unjust enrichment, *i.e.*, that "the defendant has received a benefit which would be inequitable to retain without at least compensating the plaintiff to the extent that retention is unjust."

If the majority said nothing more, and simply affirmed, the dispensation of inequitable justice would be merely deplorable. But where the majority, four legally trained and experienced minds deign to use as the preferred excuse for their actions, "Here, the appellant incurred the legal expenses paid to Barchas on his own behalf without the approval, consent, or ratification of the Association," I hang my head in shame. More shame that a court supposedly versed in high-sounding principles of equity, also wants the Association to continue mulcting the plaintiff in assessed attorney fees.

I cannot refrain from attaching the report of a more equitable tale from faraway, barbaric North Idaho, of justice administered back in the olden days when Idaho judges had a better concept of justice. Appendix A, attached. I exit from this appellate review with this passing thought: *Nemo debet locupletari ex aliena jactura,* which as applied by the majority in this case translates to "No good deed shall go unpunished."

Who was the more entitled to the benefit of the equitable doctrine which was applied in *Lynch v. Pierce* and given recognition in this case? Was it the owner of an idle $300 rusting diesel tank, or the plaintiff here who allowed the Association the fruits of his attorney's ability and labor?

## APPENDIX A

IN THE DISTRICT COURT OF THE FIRST JUDICIAL DISTRICT OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF LOUNDARY

PAT LYNCH, c/b/a Lynch Construction Company, Plaintiff,

v.

WALLY PIERCE, Defendant.

No. 3525

MEMORANDUM DECISION

Plaintiff construction company owned a 4,000 gallon diesel fuel tank that was

stored on their property at the time of the forest fire season during August of 1967. This tank was purchased by plaintiff for some $300.00 and similar tanks could be purchased in the Spokane area for about $400.00 to $500.00.

While the owners and managers of the plaintiff construction company were gone from the area, the foreman, who had been left in charge, when approached by defendant permitted him to go ahead and use the tank, but there was no agreement as to the compensation due plaintiff.

Defendant took the tank, cut a hole in one end of the tank and placed a pipe therein to permit him to use the tank as a water tank for sprinkling the roads in the fire area. About August 29th plaintiff was hired by the United States Forest Service, at the rate of $15.25 per hour, to use the aforesaid tank, a White truck tractor, and sprinkling equipment to sprinkle the water on certain roads in the fire area. Between August 29th and September 10, 1967 defendant used the truck and tank and supplied a driver and all gasoline, oil and maintenance for a period of 284 hours, and was paid therefor at the rate of $15.25 per hour. When plaintiff's managers and owners returned, they advised defendant to return the tank to the storage area or pay them $3.50 an hour for the use of the tank.

Defendant immediately returned the tank to the storage area and purchased his own tank to continue with the sprinkling operation.

Plaintiff's witnesses testified that $3.25 an hour was a reasonable charge for the use of the tank, considering the fact that this was during a forest fire season, that water sprinkler tanks were in dire need, and the Forest Service was paying $15.25 an hour for a tank mounted on a truck with the driver and gasoline, in other words, plaintiff's estimate of value was based upon the use to which the tank was being put at the time it was used by the defendant.

Defendant contends that there was no shortage of tanks, either in the Bonners Ferry area or in Spokane, and that if he was ingenious enough to put the tank on a truck and hire it out for $15.25 an hour, that he should not be forced to pay a fourth of that to the plaintiffs for the use of the tank. However, defendant offered no estimate of the reasonable value of the use of the tank during the period of time that he had it.

"It is a general principle underlying various legal doctrines and remedies that one person should not be permitted unjustly to enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained or appropriated where it is just and equitable that such restitution be made and where such action involves no violation or frustration of the law or opposition to public policy, either directly or indirectly." ... "It is not essential in order to create the obligation to make restitution for benefits, that the recipient should himself have been guilty of any tortious conduct or fault."

46 Am.Jur.P. 99

"..., the terms restitution and unjust enrichment are the modern designation for the older doctrine of quasi contracts.... Quasi contracts are not contracts but are obligations created by the law when money or property has been placed in one person's possession under such circumstances that in equity and good conscience he ought not to retain it. (Citations). Thus the substance of an action for unjust enrichment lies in a promise implied by law that one will render to the person entitled thereto that which in equity and good conscience belongs to the latter ... (Citations)."

"Going to the restatement law of restitution, we find general statements supporting the instant judgment. Sec. 1, 'A person who has been unjustly enriched at the expense of another is required to make restitution to the other.' Comment c. under the above, implies that where a person receives a benefit from another he is liable to pay therefor if the circumstances of its receipt or retention are such that as between the two it is unjust for him to retain it ..." *Duffy v. Scott*, 235 (Wis.) 142, 292 N.W. 273 [1940].

*Hixon v. Allphin,* 76 Idaho 327 [281 P.2d 1042 (1955)]

It is clear in this instance that defendant was lawfully in possession of the tank as having obtained permission from the managing agent of the plaintiffs, but that no agreement for compensation or lack of compensation had been reached. Under these circumstances it is inequitable for the defendant to retain the benefits of the property belonging to the plaintiff without paying a just compensation therefor, and the court accepts the figure of $3.25 per hour for a period of 284 hours as a reasonable compensation for the use of the tank, under the circumstances as existed at that time, and considering the benefits received by the defendant for the use of the tank.

The court therefore finds that the defendant is indebted to the plaintiff in the sum of $923.00, plus costs of the action.

Would the attorney for the plaintiff prepare appropriate Findings of Fact, Conclusions of Law and Judgment in accordance with this opinion.

Dated this 25th day of September, 1968.

/s/James G. Towles
District Judge