ROBERT W. SADLER, APPELLEE, V. JORAD, INC., A NEBRASKA
CORPORATION, APPELLEE, AND CRAIG R. CRAMM
AND GEIL E. CRAMM, APPELLANTS.
ROBERT W. SADLER, APPELLEE, V. THE SHOVELHEAD
GROUP, L.L.C., APPELLEE, AND CRAIG R. CRAMM
AND GEIL E. CRAMM, APPELLANTS.

680 N.W.2d 165

Filed May 28, 2004.   Nos. S-02-1212, S-02-1213.

Jeffrey H. Bush for appellants.

Dean F. Suing, of Katskee, Henatsch & Suing, for appellee Robert W. Sadler.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## I. NATURE OF CASE

Robert W. Sadler brought suit in the Douglas County District Court against Craig R. Cramm; Geil E. Cramm; Jorad, Inc.; and The Shovelhead Group, L.L.C. (Shovelhead), seeking an accounting and the return of money. Sadler, who held a minority interest in Jorad and Shovelhead, claimed that the Cramms had misused corporate assets. The district court entered judgment in favor of Sadler in a combined amount of $108,350.70, and the Cramms timely appealed. The cases were consolidated for purposes of oral argument and disposition.

## II. SCOPE OF REVIEW

■ A derivative action which seeks an accounting and the return of money is an equitable action. *Woodward v. Andersen,* 261 Neb. 980, 627 N.W.2d 742 (2001).

■ In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one

version of the facts rather than another. *Gilroy v. Ryberg*, 266 Neb. 617, 667 N.W.2d 544 (2003).

## III. FACTS

### 1. JORAD

In 1994, Sadler, who owned an electrical contracting business in Omaha, met Craig Cramm, who was working for a company engaged in asbestos and hazardous material abatement. The men discussed starting up a hazardous material abatement company for which Sadler would provide the primary funding. Sadler, Craig Cramm, and Cramm's wife, Geil Cramm, subsequently formed Jorad. The Cramms owned 80 percent of the stock in Jorad, and Sadler owned 20 percent.

The first meeting of Jorad's board of directors occurred in March 1995. At this meeting, Craig Cramm was elected president, vice president, and chief executive officer of the corporation. Geil Cramm was elected secretary and treasurer. Craig Cramm was to be paid and compensated in an amount not to exceed $75,000 annually during the first 3 years of Jorad's operation. This amount was to include salary and bonuses but did not include the payment of benefits and/or expenses.

At the second meeting of Jorad's board of directors in December 1995, it was determined that Craig Cramm was to be paid a salary of $75,000 for the years 1996 through 1998. In 1996 and 1997, he was to receive a 5-percent bonus based on the taxable income of the corporation at the end of the respective business years. This bonus was reduced to 1.5 percent for 1998.

Jorad operated until 2000. Jorad and Shovelhead have not been dissolved, but their operations have been wound up.

A dispute arose between Sadler and the Cramms concerning the Cramms' handling of funds in the operation of Jorad and Shovelhead. Sadler sued the Cramms, claiming that they had acted illegally, oppressively, and in a fraudulent manner with regard to the operation of the business and that they had committed corporate waste in its operation. Sadler requested equitable relief, including an accounting, the liquidation of corporate assets, and a judgment against the Cramms for funds that were diverted from the business. The Cramms denied all acts of

malfeasance and alleged that Sadler had waived his claims by attending corporate meetings and ratifying their actions.

The district court found that a forensic audit of the year 2000 conducted by Jeffrey Hamernik disclosed that excess salaries had been paid in contravention of the parties' agreement, that excess depreciation had been claimed for assets not related to the operation of the business, that expenses had been charged back to the business during the calendar years 1995 through 1998 which were not ostensibly related to the business of asbestos or lead abatement, and that the Cramms had taken excessive distributions from the operation of Jorad. The court also found that many of the records referred to by the Cramms had been destroyed, were missing, or were not produced by the Cramms for discovery and trial.

Specifically, in its order, the district court noted that although Geil Cramm testified she was a bookkeeper and office manager for Jorad and performed all of the corporation's bookkeeping and accounting functions, Trudy Riggs, a full-time employee from 1996 to 2000, testified that she was doing essentially the same work. The court imputed to Geil Cramm a salary of $30,000 per year but concluded that "the Cramms were using Geil as a balancing entry, and . . . were compensating her essentially whatever they needed that wasn't covered under Craig's compensation."

The district court found that the Cramms were unable to demonstrate a relationship between certain questioned expenses and the necessary and reasonable operation of the hazardous material abatement business. The Cramms also failed to show that the assets for which depreciation was claimed had a connection to the operation of Jorad. The court further found that Sadler had not approved these expenditures and that Sadler, a 20-percent equity owner, was entitled to $83,791.69, which represented his share of the excess compensation, the expenses that were not business related, the excess distributions, and other unnecessary or unreasonable expenses.

## 2. SHOVELHEAD

Shovelhead was formed in August 1996 for the purpose of purchasing a building where Jorad's business was to be conducted. The building was located on development property owned by

Sadler. As was the case with Jorad, the Cramms owned 80 percent of the stock in Shovelhead and Sadler owned 20 percent.

On June 14, 2002, the Shovelhead building was sold to a third party, and the proceeds of the sale were $106,000. The district court concluded that because the building had been constructed under an agreement whereby it received tax increment financing (TIF) from the city of Ralston, the moneys due Sadler had never been liquidated. The court noted that the Cramms had taken approximately $50,000 from the sale and placed it in a brokerage account in their names.

The district court found that the TIF credit attributable to the building as of June 30, 2002, was $4,094.57 and that this amount should be shown as a credit against Sadler's share. The court concluded that Sadler's distributive share of the proceeds of the sale was $28,653.58 and that Sadler was entitled to a judgment in the sum of $24,559.01 upon the liquidation of Shovelhead.

### 3. JUDGMENT OF DISTRICT COURT

The district court concluded that the Cramms had a duty to keep an accurate record of the expenses and earnings of both corporations and that the burden of proof was upon the Cramms to establish the fairness and accuracy of the transactions. The court found that the liability of the Cramms was joint and several, and it entered judgment in a combined amount of $108,350.70 in favor of Sadler together with taxable costs and postjudgment interest. The Cramms timely appealed.

### IV. ASSIGNMENTS OF ERROR

The Cramms assign the following summarized and restated errors with regard to the district court's judgment in the case involving Jorad: (1) the court's disregard of the business judgment rule, (2) its determination that Sadler had no knowledge of the conduct of the corporation, (3) its exclusion of evidence of corporate meetings in 1996 and 1997, (4) its finding that Geil Cramm's salary was excessive, (5) its imputing a salary of $30,000 per year to Geil Cramm, (6) its finding that the Cramms incurred expenses not related to the necessary and reasonable operation of the business, (7) its finding that the Cramms claimed excessive depreciation, and (8) its finding that the Cramms did not make any capital contributions in the form of cash.

The Cramms assign the following restated errors with regard to the district court's judgment in the case involving Shovelhead: (1) the court's disregard of the purchase agreement between the parties, (2) its failure to retain jurisdiction over Shovelhead so that the proceeds of the TIF could be computed and paid to the interested parties, and (3) its failure to consider the settlement of water damages in calculating the amount owed to Sadler.

## V. ANALYSIS

### 1. JORAD

The issue with regard to Jorad is whether the Cramms are personally liable for the purported misuse of corporate funds. The Cramms have grouped their arguments into essentially four areas: (1) the failure of the district court to apply the business judgment rule, (2) the court's errors with respect to findings of fact, (3) the court's findings as to excessive compensation and bonuses, and (4) the court's findings regarding expenses not related to the business and depreciation.

Before addressing the Cramms' arguments, we note that this is a derivative action brought by a minority shareholder against the remaining two shareholders, who are the officers and directors of the corporation. A derivative action is a suit by a shareholder to enforce a cause of action belonging to the corporation. *Association of Commonwealth Claimants v. Hake*, 2 Neb. App. 123, 507 N.W.2d 665 (1993). A derivative action which seeks an accounting and the return of money is an equitable action. *Woodward v. Andersen*, 261 Neb. 980, 627 N.W.2d 742 (2001).

Normally, to maintain a derivative action, a stockholder must allege that he has made demand upon the corporation unless circumstances excuse the stockholder from making such demand. See, *Weimer v. Amen*, 235 Neb. 287, 455 N.W.2d 145 (1990); *Kowalski v. Nebraska-Iowa Packing Co.*, 160 Neb. 609, 71 N.W.2d 147 (1955); *Association of Commonwealth Claimants v. Hake, supra*. However, we conclude that requiring Sadler to make a demand on Jorad would be futile.

Jorad consists of only three shareholders, and Sadler, the minority shareholder, claims that the Cramms, the other two shareholders, have misused corporate funds. Therefore, Sadler

could bring this derivative action without first having made demand upon Jorad to bring the action. A shareholder is not required to make such an effort if it would be unavailing. See *Anderson v. Clemens Mobile Homes*, 214 Neb. 283, 333 N.W.2d 900 (1983).

### (a) Business Judgment Rule

The Cramms argue that their corporate activities were protected by the business judgment rule and that the district court erred in disregarding the rule. The business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled in part on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). The Cramms assert that it was Sadler's burden to overcome the business judgment rule and that he failed to establish that Jorad suffered harm under their management. They claim that Sadler also had the burden to prove that their actions were not in good faith or in the best interests of the corporation. The Cramms argue that in the absence of fraud, gross negligence, or transgression of statutory limitations, the court should not have interfered merely to overrule and control the discretion of the directors on questions of corporate management, policy, or business. See *Royal Highlanders v. Wiseman*, 140 Neb. 28, 299 N.W. 459 (1941).

According to the business judgment rule, courts are precluded from conducting an inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes. *Association of Commonwealth Claimants v. Hake, supra.* "Within the limits of their authority directors possess full discretionary powers, and in the honest and reasonable exercise of such powers are not subject to control by stockholders or by courts at the instance of stockholders." *Royal Highlanders v. Wiseman*, 140 Neb. at 38, 299 N.W. at 464.

In 1995, Nebraska adopted the Business Corporation Act, which can now be found at Neb. Rev. Stat. § 21-2001 et seq. (Reissue 1997, Cum. Supp. 2002 & Supp. 2003). The Legislature

codified the business judgment rule as § 21-2095, which provides standards of conduct for corporate directors:

(1) A director shall discharge his or her duties as a director, including his or her duties as a member of a committee:

(a) In good faith;

(b) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

(c) In a manner he or she reasonably believes to be in the best interests of the corporation.

. . . .

(4) A director shall not be liable for any action taken as a director, or any failure to take any action, if he or she performed the duties of his or her office in compliance with this section.

In summary, the Cramms argue that to prevail in this action Sadler had to prove that their activities with regard to Jorad were contrary to § 21-2095. We disagree. Instead, the Cramms had the burden to establish the fairness and reasonableness of their operation of the corporation.

In *Anderson v. Clemens Mobile Homes*, 214 Neb. 283, 333 N.W.2d 900 (1983), a dispute arose between the minority and majority shareholders of a two-shareholder corporation. We recognized that where the intimate relationships of the parties are involved, an adequate remedy is available only within the equitable jurisdiction of the court. We pointed out that in *Donahue v. Rodd Electrotype Co. of New England, Inc.*, 367 Mass. 578, 328 N.E.2d 505 (1975), the court held that stockholders in a close corporation owed one another the same fiduciary duty as that owed by one partner to another in a partnership.

We conclude that the district court did not err with regard to the application of the business judgment rule in the case at bar. As early as *Gorder v. Plattsmouth Canning Co.*, 36 Neb. 548, 556, 54 N.W. 830, 833 (1893), we recognized that "the relation of directors to the corporation of which they are officers is of a fiduciary character" and that "dealings with respect to the corporate property will be carefully scrutinized by the courts."

Although the burden is ordinarily upon the party seeking an accounting to produce evidence to sustain the accounting, where another is in control of the books and has managed the

business, that other is in the position of a trustee and must make a proper accounting. *Anderson v. Clemens Mobile Homes, supra.* The Cramms maintained control of Jorad's books and managed the business. They each held the position of trustee and were required to make an accounting of the business activities and expenses of the corporation.

In *Woodward v. Andersen*, 261 Neb. 980, 627 N.W.2d 742 (2001), the parties were married to each other. George Woodward, a minority shareholder, alleged that Nancy Andersen, the president of the corporation, mismanaged the corporation and wrongfully withdrew funds therefrom. We held that under such circumstances, Andersen, an officer and director of the corporation, owed a fiduciary duty to the corporation and its stockholders and was considered a trustee, citing *Evans v. Engelhardt*, 246 Neb. 323, 518 N.W.2d 648 (1994). Once Woodward presented evidence of an alleged breach of Andersen's duty, the burden shifted to Andersen to prove the fairness of those transactions.

■ *Evans* was a derivative action by a minority shareholder who alleged that the majority shareholders had paid themselves unreasonable salaries. The minority shareholder sought an accounting and the return of money. We held that an officer or director of a corporation occupies a fiduciary relation toward the corporation and its stockholders and is treated by the courts as a trustee. We noted that the burden of proof is upon the party holding a confidential or fiduciary relationship to establish the fairness, adequacy, or equity of the transaction with the party with whom he holds such relation, citing *Rettinger v. Pierpont*, 145 Neb. 161, 15 N.W.2d 393 (1944). We concluded in *Evans* that it was the burden of the majority shareholders to show that their salaries were reasonable.

Sadler presented evidence that the Cramms had allegedly breached their fiduciary duty to him. Accordingly, the burden shifted to the Cramms to establish by a preponderance of the evidence the fairness, adequacy, and equity of their actions. See *Woodward v. Andersen, supra.*

The Cramms were required to show that the actions they took as directors and officers of the corporation were performed in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a

manner that they reasonably believed to be in the best interests of the corporation. See § 21-2095. They failed to do so. Thus, the Cramms' argument that the district court misapplied the business judgment rule is without merit.

### (b) Findings of Fact

The Cramms assert that the district court erred in finding that Sadler had no knowledge of the Cramms' conduct in running the corporation and that Sadler had been oppressed by the Cramms. They claim that the court improperly excluded evidence of corporate meetings. We conclude that there is no merit to this claim.

The judgment of the district court was based upon its determination that the Cramms had misappropriated corporate funds. The court found that the Cramms had breached their fiduciary duties by acting in a manner that was detrimental to the value of the business and the assets of the corporation. The court also found that the Cramms misappropriated assets and moneys belonging to Jorad.

The Cramms argue that the district court erred in finding that Sadler had no knowledge of the activities of the corporation and in excluding evidence of corporate meetings for the years 1996 through 1998. When the Cramms attempted to offer the notices and minutes of said corporate meetings, Sadler objected because the exhibits had not been included in the documents requested during discovery. The court sustained the objection, and the Cramms made an offer of proof to show that Sadler was present at the annual corporate meetings in February 1996 and 1997. We note that the offer of proof for 1997 is not consistent with the corresponding exhibit. The exhibit does not show that Sadler was present at the 1997 meeting. No one contends that Sadler was present for the 1998 meeting.

Although the district court stated that Sadler testified that there were no corporate meetings in 1996 or 1997, whether there were corporate meetings in 1996 or 1997 is not material to the decision in this case. The minutes of the meetings merely reflected who was present and who was elected to serve as the officers and directors of the corporation. Therefore, even if the court should not have excluded the evidence of the corporate meetings in 1996 and 1997, we conclude it was harmless error.

The judgment of the court was based upon the Cramms' misuse of corporate funds. The court found that the Cramms had breached their fiduciary duties to Jorad and Shovelhead by acting in a manner that was detrimental to the value of the business and assets of the corporation. It was upon this activity that the court found against the Cramms.

In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Gilroy v. Ryberg*, 266 Neb. 617, 667 N.W.2d 544 (2003). The evidence as to the manner in which the Cramms ran the corporation was in conflict, and we accept the district court's findings of fact regarding these issues.

### (c) Excessive Compensation

The Cramms argue that the district court erred in finding that Geil Cramm's salary was excessive. They claim that Sadler presented no expert testimony regarding industry standards for the compensation of executives in the hazardous material abatement business. Sadler testified that he believed $25,000 per year was a reasonable salary for Geil Cramm.

During the peak years of its operation, Jorad had 27 employees, and the Cramms set the salaries of the employees. Craig Cramm testified that he set the salary for Geil Cramm and that he generally used industry standards and the experience of the individual to set the appropriate salary. He claimed that he set Geil's salary based upon her level of involvement with the corporation's activities.

During 1997, Geil Cramm worked away from the office at the site of a new building project. Riggs testified that in January 1997, she took over the work that Geil Cramm had been doing prior to that time. Hamernik, who testified on behalf of Sadler, stated that based upon Jorad's bylaws and his discussions with Riggs, it was his opinion that Geil Cramm should not have been paid any amount in 1997.

Testimony was presented at trial which established that a large portion of Geil Cramm's compensation stemmed from the payment of periodic bonuses. Craig Cramm testified that he consulted one of Jorad's accountants before any of these bonuses were paid to Geil Cramm and that the purpose behind the bonuses was to pay estimated taxes.

The district court imputed a salary of $30,000 per year to Geil Cramm. The forensic audit showed that she was paid $36,445, $68,867, $104,790, and $36,372 in 1995 through 1998 respectively. The audit showed that for the same years, Craig Cramm was paid $113,235, $75,992, $75,490, and $137,369. The court concluded that the Cramms were using Geil Cramm's salary as a balancing entry and "were compensating her essentially whatever they needed that wasn't covered under Craig's compensation." It was the combination of salary paid and bonuses received that led the court to conclude that Geil Cramm's compensation was excessive.

Where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *id*. We accept the district court's findings, and we conclude that the Cramms' argument regarding Geil Cramm's salary is without merit.

(d) Expenses Not Related to Business and Depreciation

The Cramms argue that the district court erred in its findings regarding expenses not related to the business and depreciation. With respect to the expenses, Craig Cramm testified that the Internal Revenue Service (IRS) had reviewed the Cramms' tax statements for the years 1996 through 1998 and that while some of the expenses listed as business deductions were not allowed, the majority were allowed. His accountant testified that there was an IRS examination in the summer of 1997 which resulted in no changes to the corporation's tax liability.

Our review of the record shows that there is little, if any, evidence to support the Cramms' testimony as to these expenses. Exhibits 64 and 86, which were introduced by the Cramms on this issue, do not show what expenses were examined by the

IRS. The Cramms had the burden of proof to establish the fairness, adequacy, and equity of the transactions in question.

With regard to the questioned expenses, the district court was faced with a conflict in the evidence, and it elected to give more credence to Hamernik's report than to the evidence offered by the Cramms. The court noted that many of the records referred to by the Cramms had been destroyed or were missing. The court accepted one version of the facts as opposed to another, and we conclude that it did not err in this respect.

Regarding the excess depreciation, Hamernik's report shows that these figures were based on a number of automobiles that the Cramms claimed were used as corporate vehicles. The Cramms argue that the district court erred in failing to find that the automobiles for which the depreciation was claimed had a connection to the operation of Jorad.

The record indicates that the district court included this depreciation when calculating the monetary damages awarded to Sadler. The court found that the total depreciation claimed for assets not related to the operation of the business was $51,750.51, and it awarded Sadler 20 percent of this amount, or $10,350.10. We conclude there is no evidence that would establish how this depreciation would equate with a direct cash loss of $10,350.10 to Sadler. We therefore reduce the judgment with regard to the claim involving Jorad from $83,791.69 to $73,441.59.

### 2. SHOVELHEAD

As to Shovelhead, the Cramms have asserted three assignments of error. The first two involve the district court's calculation of the amount owed Sadler due to the sale of the property formerly owned by Shovelhead and the winding up of the affairs of the company.

First, the Cramms argue that the district court disregarded exhibit 61, the purchase agreement whereby Shovelhead purchased property from Sadler and his wife. In particular, the Cramms believe that the court failed to give credence to the following language:

> The parties agree and confirm that a Tax Increment and Financial application has been approved by the [C]ity of Ralston on behalf of the Sadler Business Park Development.

> It is the intent of the party [sic] that One Hundred percent of the benefits from the tax increment financing apportioned according to the amount of property owned by The Shovelhead Group L.L.C., as a percentage of the development shall be payable to purchaser in accordance with the ownership interests in Shovelhead Group L.L.C. which has been established in accordance with Nebraska Law. The disbursements made by the City of Ralston as a result of the T.I.F. shall be paid out in accordance with the ownership interests of the L.L.C. no more than ten (10) days after receipt from the local government entity. Payments shall be made directly from purchaser to the shareholders of the L.L.C. in accordance with their percentage of ownership.

According to the Cramms, this language sets no limitation on the payments to be made to Shovelhead as a result of the TIF.

Sadler testified that the TIF was to last for 15 years. The Cramms assert that Sadler has never paid any portion of the TIF to Shovelhead. The Cramms consider Sadler's distribution from the sale of the Shovelhead property and the winding up of Shovelhead to be equivalent to the TIF which was to be paid over the entire 15-year period. They believe that they are holding this amount in trust for Shovelhead and its interest holders.

The Cramms' second assignment of error pertains to the district court's failure to retain jurisdiction over Shovelhead so that the proceeds of the TIF can be computed and paid out over the 15-year period. When the court made its calculations regarding Shovelhead, it started with the figure it had calculated to be Sadler's distributive share as of June 30, 2002. This was the end of the month during which the Shovelhead property was sold to a third party. The court then discounted this figure by the amount of the TIF still owed to the Cramms as of the end of June.

A review of the purchase agreement finds this method of calculating Sadler's distribution to be correct. While the Cramms contend that the agreement contains no language limiting the payments to be made as a result of the TIF, the agreement clearly states that the TIF is to be paid in proportion to the amount of the property owned by Shovelhead. Since Shovelhead ceased owning the property as of June 14, 2002, that was the appropriate time for the TIF payments to Shovelhead to cease. The district

court did not err in this respect, and the Cramms' first two assignments of error have no merit.

The Cramms' final assignment of error pertains to the district court's failure to consider a settlement related to water damage to the Shovelhead property in calculating Sadler's distribution. Craig Cramm testified that the Shovelhead property experienced water damage due to the faulty installation of a wall and that Sadler was aware of this damage. When the Shovelhead property was sold to a third party, a settlement was reached as to this damage in the amount of $4,000.

The Cramms argue that Sadler was never held responsible for his share of the $4,000 settlement, which would be $800. However, since the $4,000 was deducted from the sale price of the property, Sadler has been held responsible for his share of the settlement via the discounted sale price. Accordingly, the district court did not err in its failure to discount Sadler's distribution by this amount.

### VI. CONCLUSION

For the above-stated reasons, the decision of the Douglas County District Court is affirmed as modified.

AFFIRMED AS MODIFIED.