2005 WY 156

Ronald MUELLER, as an individual and Director of the Star Valley Ranch Association; and William L. Daley, an individual, Appellants (Plaintiffs),

v.

Vince ZIMMER, an individual; and Steve Crittenden, an individual, Appellees (Defendants).

Ronald Mueller, as an individual and Director of the Star Valley Ranch Association; and William L. Daley, an individual, Appellants (Plaintiffs),

v.

Star Valley Ranch Association, a Wyoming non-profit corporation; Star Valley Ranch Association Board of Directors, in their official capacity; Roger Cox, an individual; and Cox, Ohman & Brandstetter, an Idaho chartered law firm, Appellees (Defendants).

Nos. 05–9, 05–10.

Supreme Court of Wyoming.

Dec. 5, 2005.

Representing Appellants: Robert J. Logan of Thayne, Wyoming.

Representing Appellees: John R. Hursh of Central Wyoming Law Associates, P.C., Riverton, Wyoming, for Appellees Zimmer and Crittenden; William K. Rounsborg of White and Steele, P.C., Denver, Colorado, for Appellees Star Valley Ranch Association and Star Valley Ranch Association Board of Directors; and Donald F. Carey of Quane Smith, LLP, Idaho Falls, Idaho, for Appellees Cox and Cox, Ohman & Brandstetter.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

HILL, Chief Justice.

[¶ 1] The Star Valley Ranch Association (the Association) is a nonprofit, mutual benefit corporation that manages a recreational residential subdivision in Lincoln County, Wyoming. The Association is incorporated under the Wyoming Nonprofit Corporation Act, Wyo. Stat. Ann. §§ 17–19–101, *et seq.* (LexisNexis 2005). A Board of Directors governs the Association with its members elected by the lot owners within the subdivision. The day-to-day operations of the Association are managed by a general manager, who is hired by and serves at the pleasure of the Board. Appellant Ronald D. Mueller (Mueller) is a lot owner and a member of the Association's Board of Directors. Appellant William L. Daley is a lot owner. Appellants

filed a derivative action [1] against the Association, its Board of Directors (the Board), and former directors and general managers of the Association. Appellants alleged that through fraud, misrepresentation, and conflict of interest transactions, the former directors and general managers deprived the Association of money to which it was entitled and that the Board breached its fiduciary duty to the Association members by failing to collect those funds. Appellants also filed a declaratory judgment action seeking to have an election to amend the Association bylaw setting the number of directors on the Board declared void. The district court granted summary judgment motions filed by the various defendants, and Appellants appeal. We affirm the summary judgments on the derivative action and finding that one of the Appellants' claims was frivolous, we award the defendants their costs, including attorneys' fees incurred in defending against that claim. We also affirm the district court's summary judgment on the declaratory judgment action.

## ISSUES

[¶ 2] In Case No. 05–09, the Appellants set forth the following issues:

1. Did the District Court err in granting summary judgment to Steve Crittenden when there were material facts in dispute as to whether Crittenden and the Star Valley Ranch Association ever had an oral agreement settling the overpayment of Crittenden's salary and other alleged benefits?

2. Did the District Court err by granting summary judgment to Vince Zimmer when there were material facts in dispute and Zimmer failed to refute the allegation of fraud?

3. Was the settlement agreement between Vince Zimmer and the Star Valley Ranch Association void as a matter of public policy?

4. Was the hiring of Steve Crittenden and Vince Zimmer as general managers without a personal services contract an ultra vires act?

Defendants Vince Zimmer (Zimmer) and Steve Crittenden (Crittenden) responded with a statement of two issues:

1. With reference to Appellee Crittenden, was the District Court correct in granting Summary Judgment on the basis of a salary overpayment settlement ratified by the Board of Directors of Star Valley Ranch Association within which any and all prior antecedent salary and employment issues merged, which settlement has been fully performed absent the showing by pleading or otherwise of any fraud as required by Wyoming law?

1. Wyo. Stat. Ann. § 17–19–630 (LexisNexis 2005) provides:
      (a) A proceeding may be brought in the right of a domestic or foreign corporation to procure a judgment in its favor by:
      (i) Any member or members having five percent (5%) or more of the voting power or by fifty (50) members, whichever is less; or
      (ii) Any director.
      (b) In any proceeding under this section, each complainant shall be a member or director at the time of bringing the proceeding.
      (c) A complaint in a proceeding brought in the right of a corporation shall be verified and allege with particularity the demand made, if any, to obtain action by the directors and either why the complainants could not obtain the action or why they did not make the demand. If a demand for action was made and the corporation's investigation of the demand is in progress when the proceeding is filed, the court may stay the suit until the investigation is completed.

      (d) On termination of the proceeding the court may require the complainants to pay any defendant's reasonable expenses, including counsel fees, incurred in defending the suit if it finds that the proceeding was commenced frivolously or in bad faith.
      (e) If the proceeding on behalf of the corporation results in the corporation taking some action requested by the complainants or otherwise was successful, in whole or in part, or if anything was received by the complainants as the result of a judgment, compromise or settlement of an action or claim, the court may award the complainants reasonable expenses, including counsel fees.
      (f) The complainants shall notify the secretary of state within ten (10) days after commencing any proceeding under this section if the proceeding involves a public benefit corporation or assets held in charitable trust by a mutual benefit corporation. The secretary of state shall then notify the attorney general.

2. With reference to Appellee Zimmer, was the District Court correct in granting Summary Judgment giving full effect to a written settlement agreement ratified by the Board of Directors of Star Valley Ranch Association within which all previous claims and disputes merged, which settlement agreement has been fully performed, absent a showing of a viable fraud claim?

In Case No. 05–10, the Appellants set out these issues:

A. Re Appellees Roger Cox and Cox, Ohman & Brandstetter

1. As a matter of law, was the transaction between the Association, Cox and Cox, Ohman & Brandstetter a conflict of interest transaction and, if so, did Cox obtain specific board approval required by state law and the Association Bylaw regulating conflict of interest transactions?

2. Did the District Court err in precluding Appellants from inquiring into the early billings of Cox, Ohman & Brandstetter and then use information from those billings to conclude that all charges were in furtherance of corporation business and that there was only an 8% average markup on the bills?

3. Did the District Court err in precluding the claim of negligent misrepresentation and fraud against Roger Cox?

B. Re Appellees Star Valley Ranch Association and its Board of Directors

1. Did the District Court err in not applying the more specific bylaw in determining if the increase in the size of the board of directors received the necessary affirmative vote?

2. Did the District Court err in concluding that the Association was not required to maintain records of actions taken by the members and the board?

3. Did the District Court err in determining that the Board exercised good business judgment in its deci-sion to not seek the return of overpayment of salaries and benefits from prior general managers and the return of monies earned from a conflict of interest transaction without specific board approval[?]

Defendant Roger Cox (Cox) and the law firm of Cox, Ohman & Brandstetter (the law firm) reply with these issues:

1. Does this Court lack subject matter jurisdiction?

2. Did the trial court properly grant Roger Cox and Cox, Ohman & Brandstetter's motion for summary judgment on the equitable defenses of estoppel by acquiescence, laches and promissory estoppel as against Appellants' shareholder derivative lawsuit?

The Association and the Board offer the following statements of the issues:

1. Was the District Court correct in concluding that Appellees' properly placed Motion for Summary Judgment with respect to the change in the number of members of the Board of Directors from five to seven ought to be granted when Appellants failed to come forward with any competent and admissible evidence to call into question the vote of the membership to effect such change?

2. Was the District Court correct in concluding that Appellees' properly placed Motion for Summary Judgment with respect to Appellants' derivative claims concerning expense reimbursements to Cox ought to be granted when Appellants failed to come forward with any competent and admissible evidence to call into question the validity of those reimbursements, or to identify any legal authority to allow Appellants to challenge the actions of the Board?

3. Was the District Court correct in concluding that Appellees' properly placed Motion for Summary Judgment with respect to Appellants' derivative claims concerning alleged salary overpayments to Crittenden and Zimmer ought to be granted when Appellants failed to come forward with any com-

petent and admissible evidence to call into question the validity of the decision not to pursue recovery of those alleged overpayments, or to identify any legal authority to allow Appellants to challenge the actions of the Board?

## STANDARD OF REVIEW

[¶ 3] Our oft reiterated and well established standard for reviewing appeals from a summary judgment order:

> When we review a summary judgment, we have before us the same materials as did the district court, and we follow the same standards which applied to the proceedings below. The propriety of granting a motion for summary judgment depends upon the correctness of the dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. *Reed v. Miles Land and Livestock Company*, 2001 WY 16, ¶ 9, 18 P.3d 1161, ¶ 9 (Wyo.2001). A genuine issue of material fact exists when a disputed fact, if proven, would have the effect of establishing or refuting an essential element of an asserted cause of action or defense. We, of course, examine the record from a vantage point most favorable to that party who opposed the motion, affording to that party the benefit of all favorable inferences that fairly may be drawn from the record. *Scherer Construction, LLC v. Hedquist Construction, Inc.*, 2001 WY 23, ¶ 15, 18 P.3d 645, ¶ 15 (Wyo.2001); *Central Wyoming Medical Laboratory, LLC v. Medical Testing Lab, Inc.*, 2002 WY 47, ¶ 15, 43 P.3d 121, ¶ 15 (Wyo.2002).

> *Burnham v. Coffinberry*, 2003 WY 109, ¶ 9, 76 P.3d 296, ¶ 9 (Wyo.2003). Questions of law are reviewed *de novo*.

*Martin v. Committee for Honesty and Justice at Star Valley Ranch*, 2004 WY 128, ¶ 8, 101 P.3d 123, 127 (Wyo.2004). We may uphold the grant of summary judgment upon any proper legal ground finding support in the record. *Coates v. Anderson*, 2004 WY 11, ¶ 5, 84 P.3d 953, 956 (Wyo.2004).

## DISCUSSION

### *Jurisdiction*

[¶ 4] Before getting to the substance of the parties' arguments regarding the propriety of the district court's summary judgment orders, we must first address two issues questioning our jurisdiction to resolve these appeals raised by Appellee Cox.

[¶ 5] Cox contends that this Court lacks subject matter jurisdiction because the motions for summary judgment filed by the various defendants were not ruled upon by the district court within 90 days, and by operation of W.R.C.P. 6(c)(2), they were deemed denied.[2] Cox relies on our decision in *Paxton Resources, LLC v. Brannaman*, 2004 WY 93, 95 P.3d 796 (Wyo.2004). That case concerned the consequences of a trial court's failure to timely issue an order on post-trial motions. Under Wyoming's Rules of Appellate Procedure, a notice of appeal must be filed within 30 days of the entry of the appealable order. W.R.A.P. 2.01(a). That time period may be tolled by the filing of a motion for judgment under W.R.C.P. 50(b), a motion to amend or make additional findings of fact under W.R.C.P. 52(b), a motion to alter or amend the judgment or for a new trial under W.R.C.P. 59. W.R.A.P. 2.02(a). The 30–day time period for filing a notice of appeal commences to run upon the entry of any order granting or denying the motions for judgment, to amend or make additional findings of fact, to alter or amend the judgment or upon the denial of a motion for a new trial. W.R.A.P. 2.02(b). If no order is entered, however, the full time for appeal commences to run when the motions are deemed denied. *Id.* A motion is deemed denied if it has not been determined within 90 days after it was filed. W.R.C.P. 6(c)(2). In *Paxton*, the jury rendered a verdict, and Paxton filed motions under W.R.C.P. 50 and 59 for judgment as a matter of law, for new trial, and for remittitur. *Paxton*, 95 P.3d at

---

**2.** In his brief, Cox's argument concerns only the summary judgment filed by him. Since the issue ostensibly concerns the subject matter jurisdiction of this Court, and the motions for summary judgment filed by the other defendants are in the same procedural posture as that filed by Cox, our discussion encompasses all of the motions.

797–98. The 90–day "deemed denied" date passed, as well as the 30–day period for filing a notice of appeal, before the district court issued an order denying the motions. *Id.* at 799. After noting that Rule 6(c)(2) did not allow for any continuances and that the whole point of a "deemed denied" provision was that the judgment would automatically become final and appealable upon passage of the specified time, we held that the district court no longer had jurisdiction to consider the motions once that occurred. *Id.* at 800–802. We concluded that an appeal not filed within 30 days after post-trial motions were deemed denied is untimely and would be dismissed. *Id.* at 802.

[¶ 6] The procedural chronology in this case is as follows:

- July 1, 2003—Zimmer and Crittenden file motion for summary judgment.

- July 3, 2003—Cox and Cox, Ohman & Brandstetter file motion for summary judgment.

- October 6, 2003—The Association and Board file motion for summary judgment.

- October 21, 2003—Appellants file cross-motion for partial summary judgment.

- November 17, 2003—Hearing held on summary judgment motions.

- July 14, 2004—District court issues Decision Letter granting the summary judgment motions filed by all of the defendants and effectively denying Appellants' motion.

- August 13, 2004—Order granting Zimmer and Crittenden motion for summary judgment entered.

- September 7, 2004—Order granting motion for summary judgment filed by Cox and Cox, Ohman & Brandstetter entered.

- September 9, 2004—Appellants file notice of appeal of order granting Zimmer and Crittenden summary judgment.

- September 27, 2004—Order granting motion for summary judgment filed by the Association and the Board entered.

- October 1, 2004—Notice of appeal from the orders granting summary judgment for Cox and Cox, Ohman & Brandstetter and the Association and Board filed by Appellants.

Obviously, 90 days passed from the filing of all of the motions for summary judgment filed by the parties before the district court ruled on them. There are, however, several critical differences between the situation here and those present in *Paxton* that lead us to reject Cox's argument.

[¶ 7] The key to the holding in *Paxton* was that the 30–day period for filing an appeal had commenced upon passage of the "deemed denied" date and had already lapsed when the district court finally issued its decision on the defendants' post-trial motions. The district court did not have jurisdiction to rule on those motions, however, because the judgment became final upon the lapse of the time in which an appeal could be filed. As we recently stated in a case where the defendant had filed a renewed motion for extension of time to file a response to discovery requests for admission after a previous motion for the same was deemed denied under Rule 6(c)(2):

> The difference between the *Paxton* case and the case at bar is obvious. In *Paxton*, the "deemed denied" rule applied to a final judgment; conversely, in this case, the "deemed denied" rule simply applied to an interlocutory discovery motion. The case law is replete with instances where renewed discovery motions are considered. (Citations omitted.)

*Hodges v. Lewis & Lewis, Inc.*, 2005 WY 134, ¶ 21, 121 P.3d 138, 145 (Wyo.2005). Here, the motions were for summary judgment—they were not post-trial motions. When the summary judgment motions were deemed denied by the lapse of 90 days from their filing, the district court did not lose jurisdiction because the denial of a motion for summary judgment is not a final appealable order.[3] *McLean v. Hyland Enterprises, Inc.*,

---

**3.** There are two exceptions to this rule: when the district court grants one party's motion for summary judgment while denying the opposing party's summary judgment motion and the decision completely resolves the case, and when there is a denial of a summary judgment motion on the issue of qualified immunity. *McLean*, 34 P.3d at 1267–68; *see also Lieberman v. Wyoming.com*

2001 WY 111, ¶ 17, 34 P.3d 1262, 1267–68 (Wyo.2001). There was no final judgment at the time the motions were deemed denied, so the rule in *Paxton* is simply not applicable to the situation before us in this case, and we have jurisdiction over the matter.[4]

[¶ 8] The second jurisdictional issue raised by Cox is a contention that the district court did not issue an appealable order because its ruling on Cox's motion for summary judgment did not resolve all issues between him and Appellants. Specifically, Cox argues that he did not move for summary judgment on a fraud claim advanced by Appellants alleging that Cox had made a false statement to the Board regarding a claim by Zimmer for unpaid overtime. Since the judgment on his motion could only be viewed as a partial grant of summary judgment and there was no entry of a final judgment upon an express determination that there was no just reason for delay pursuant to W.R.C.P. 54(b), Cox contends that this appeal must be dismissed.

[¶ 9] In their motion for summary judgment, Cox and Cox, Ohman & Brandstetter set forth the following prayer for relief:

WHEREFORE, Defendants Cox and Cox, Ohman & Brandstetter respectfully request that this Court grant their motion for summary judgment and **dismiss Plaintiffs' Revised First Amendment to First Amended Complaint against them with prejudice** and for such further and additional relief as the Court deems appropriate under the circumstances. [Emphasis added.]

In their Revised First Amendment to First Amended Complaint, the Appellants alleged that Zimmer had knowingly made a fraudulent claim for unpaid overtime. With respect to Cox, the Appellants alleged that he had made false statements regarding the validity of Zimmer's overtime claim to the Board. In

order for the district court to grant Cox the relief requested in his motion for summary judgment—dismissal of Appellants' Revised First Amendment to First Amended Complaint with prejudice—it necessarily would have had to determine all claims raised against Cox therein. Indeed, in its decision letter, the district court stated that:

Summary judgment in favor of Cox is granted for the reasons set forth in Cox's motion and memoranda. The finding that Cox's billings were appropriate pursuant to an agreement precludes the claims of negligent misrepresentation and **fraud.** [Emphasis added.]

As the fraud claim set forth in the Revised First Amendment to First Amended Complaint was the only fraud claim against Cox, it is clear that the district court considered the matter raised by Cox's summary judgment motion and proceeded to determine it. All indications in the record are that the motion for summary judgment was for dismissal of all claims against Cox in their entirety. There is nothing that even remotely suggests that Cox intended or the district court ever considered the motion as a partial one excluding the fraud claim. Cox's argument is without merit; the district court order on Cox's motion for summary judgment was a final, appealable order, and this Court has jurisdiction over the appeal.

### Derivative claims alleging fraud against Zimmer, seeking restitution from Crittenden for overpaid salary and breach of fiduciary duty by the Board for failure to seek reimbursement

[¶ 10] Zimmer was elected to the Board in 1996. He resigned that position to accept an appointment from the Board as general manager of the Association. Zimmer resigned from that position in January of 2000.

*LLC,* 11 P.3d 353, 356 (Wyo.2000) (denial of cross-motion for summary judgment); and *Lawson v. Garcia,* 912 P.2d 1136, 1138 (Wyo.1996) (qualified immunity). Neither exception is applicable here.

4. Cox only argues the applicability of *Paxton* and does not raise any argument regarding the district court's authority to *sua sponte* reconsider a previously denied motion for summary judgment. Accordingly, we will not make that determina-

tion today but note that what little authority that appears to exist on this point indicates that trial courts do possess such authority as part of their inherent powers. *See Schachter v. Citigroup, Inc.,* 126 Cal.App.4th 726, 23 Cal.Rptr.3d 920 (2005) (courts have such authority within limits established by California statute); and *Chubb Group of Insurance Companies v. Guyuron,* 1995 WL 739618, 1995 Ohio App. Lexis 5512.

Contemporaneously with his resignation, Zimmer submitted a request for unpaid overtime incurred attending Board ordered meetings and other obligations. The Board denied Zimmer's request.

[¶ 11] It was later discovered that a clerical error had resulted in Zimmer's salary being overpaid by $2,025.87. After giving Zimmer credit for paid time off, the Board sent Zimmer a letter demanding repayment of $1,380.47. Zimmer responded in writing reasserting his demand for unpaid overtime, which he estimated to be $2,482.96. The Board's staff recommended that the matter be settled as the legal costs of pursuing collection were not worth the amount in dispute. A mutual release was then executed wherein the Association released Zimmer from all claims of overpayment while Zimmer released his claims for unpaid overtime and any other compensation earned during his employment as general manager.

[¶ 12] After Zimmer resigned as general manager, the Board began a search for his replacement. The Board wanted Crittenden to temporarily assume the general manager duties during the interim. At the time, Crittenden was a director on the Board, and the Association's bylaws prohibited a director from serving as general manager. As a compromise, the Board created the position of "Business Agent" to allow Crittenden to continue to serve as a director and fulfill the duties of the general manager until a permanent replacement for Zimmer was found. In March of 2000, Crittenden accepted appointment as general manager on a permanent basis and resigned his directorship.

[¶ 13] As with Zimmer, it was discovered that Crittenden had been overpaid. Crittenden believed that the amount of overpayment was $562.85. He instructed the payroll clerk to withhold $281.43 for two consecutive pay periods. On June 23, 2001, Crittenden was terminated as general manager. In October of 2001, a finance committee determined that Crittenden had been overpaid $1,520.13 more than the amount Crittenden had withheld from his paycheck. In September of 2002, the general manager of the Association sent a demand letter to Crittenden requesting repayment of that amount. Crittenden responded that he had made restitution by having the $562.85 withheld from his paycheck and that a prior Board meeting in executive session had approved that as a full settlement of the issue. The Board's staff recommended that the matter be settled as the legal costs of pursuing collection were not worth the amount in dispute. On November 16, 2002, the Board, citing the previous agreement with Crittenden, voted four to one to settle the claim.

[¶ 14] In their Complaint, Appellants alleged that Zimmer's claim for unpaid overtime was false and fraudulent. They contended that Zimmer "knowingly and with intent to deceive" made an "unjustified and false" claim for unpaid overtime in order to mislead the Board and so avoid having to make restitution on the overpaid salary. Appellants alleged that the Board knew or should have known that Zimmer's claim for overtime was meritless and that its failure to seek full restitution for the overpayment breached its fiduciary duty to the Association members and constituted a waste of Association assets. The district court granted Zimmer's motion for summary judgment. No reason was specified for the ruling; the court only stated that the motion was granted for reasons set forth by Zimmer in his motion and memoranda.

[¶ 15] With regard to Crittenden, Appellants alleged that the Board should not have approved the settlement because there was no evidence that a previous Board had forgiven the overpayment to Crittenden and that by doing so, the Board breached its fiduciary duty to the Association's members. Appellants sought restitution from Crittenden for the full amount of overpayment. The district court granted summary judgment without analysis.

■ [¶ 16] We begin with the fraud claim against Zimmer. In order to establish fraud, a plaintiff must demonstrate, by clear and convincing evidence, that: (1) the defendant made a false representation intended to induce action by the plaintiff; (2) the plaintiff reasonably believed the representation to be true; and (3) the plaintiff relied on the false representation and suffered damages. *Bitker v. First National Bank in Evanston,*

2004 WY 114, ¶ 12, 98 P.3d 853, 856 (Wyo. 2004). Within the context of a summary judgment, we have said the following regarding claims of fraud:

When determining if a genuine issue of material fact exists regarding a claim of fraud, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability. [*Lee v. LPP Mortgage, Ltd.*, 2003 WY 92, ¶ 12, 74 P.3d 152, 158 (Wyo.2003).] In ruling on a motion for summary judgment, "the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* A demonstration of a genuine issue of material fact requires more than repeated assertions that a defendant is liable. *Radosevich v. Board of County Commissioners of the County of Sweetwater*, 776 P.2d 747, 750 (Wyo.1989).

... Assuming the pleadings alleged fraud with sufficient particularity, and the parties accused of fraud have presented facts in support of a motion for summary judgment that refute the allegations of fraud, the party relying upon the fraud claims then must demonstrate the existence of genuine issues of material fact by clear, unequivocal and convincing evidence. [*Richardson v. Hardin*, 5 P.3d 793, 797 (Wyo.2000).]

*Bitker*, ¶¶ 11–12, 98 P.3d at 855–56.

■■■■ [¶ 17] After reviewing the record, we conclude that the district court was correct to grant summary judgment. Appellants' allegation of fraud was not pleaded with particularity. Indeed, allegations of fraud are all that Appellants have provided; there are no facts to support their claim. Appellants' allegation of fraud is entirely predicated on their belief that Zimmer's claim for overtime was without merit. However, there is no evidence in the record that Zimmer knew his claim was false or without merit. We are presented only with Appellants' speculations on Zimmer's motives. This is not sufficient to meet Appellants' burden to demonstrate that genuine issues of material fact existed by "clear, unequivocal, and convincing evidence" in response to Zimmer's motion for summary judgment. *See Bitker*, ¶ 13, 98 P.3d at 856.

■■■■■ [¶ 18] Furthermore, whether or not Zimmer's claim for overtime had merit or not is irrelevant to whether the mutual release he signed with the Board was valid.

This Court has on several occasions addressed the theory of "compromise and settlement." In *Parsley v. Wyoming Automotive Co.*, 395 P.2d 291, 295 (Wyo.1964), we described the general rule of compromise and settlement as being "that the settlement of a bona fide dispute or a doubtful or unliquidated claim, if made fairly and in good faith, is a sufficient consideration for a compromise based thereon." We have defined a compromise as " 'an agreement between two or more persons who, to avoid a lawsuit, amicably settle their differences on such terms as they can agree on.' " *Peters Grazing Ass'n v. Legerski*, 544 P.2d 449, 456 n. 3 (Wyo. 1975) (*quoting* 15A C.J.S. *Compromise and Settlement* § 1 at 170). A settlement agreement is a contract and, therefore, subject to the same legal principles that apply to any contract. *In re Estate of Maycock*, 2001 WY 103, ¶ 10, 33 P.3d 1114, 1117 (Wyo.2001); *Matter of Estate of McCormick*, 926 P.2d 360, 362 (Wyo.1996). The elements are the same as the elements of any contract: offer, acceptance, and consideration, and establishment of the existence of these elements leads courts to conclude that mutual assent has occurred. *Matter of Estate of McCormick*, 926 P.2d at 362. A compromise and settlement agreement is, also like other contracts, subject to construction as a matter of law. *Ludvik v. James S. Jackson Co., Inc.*, 635 P.2d 1135, 1143 (Wyo.1981).

*A contract made in settlement of claims is valid even if the claims settled are of doubtful worth....This means that this court will not look behind a settlement agreement to see who would have prevailed in a dispute out of which the settlement agreement arises. If the settlement agreement itself meets contractual requirements, it will be enforced.*

*Kinnison v. Kinnison*, 627 P.2d 594, 596 (Wyo.1981).

*Dobson v. Portrait Homes, Inc.*, 2005 WY 95, ¶ 9, 117 P.3d 1200, 1204 (Wyo.2005) (emphasis added). We are not concerned with the worth of Zimmer's claim for overtime. The question we are concerned with here is whether or not the settlement agreement satisfies the requirements of a contract. The answer is unequivocally yes. Both parties to the agreement agreed to relinquish a claim that they had against the other in exchange for the other party to doing the same with their claim. When a party asserting a "claim relinquishes it as part of a compromise and settlement, such a concession is sufficient consideration for the promise or act of the other party." *Dobson*, ¶ 10, 117 P.3d at 1205. The summary judgment on the fraud claim against Zimmer is affirmed.

[¶ 19] Returning to Crittenden, Appellants argue that summary judgment was improper because there are facts in dispute as to whether or not a prior agreement existed between Crittenden and a previous board. Appellants contend that no reasonable board would have approved a settlement under these circumstances.

[¶ 20] We held many years ago that in a case where a minority stockholder sought to have the sale of certain corporate assets declared void that "[i]n the absence of fraud, the fact that a difference of opinion may have existed between the majority and minority shareholders would not justify interference by a court of equity." *Smith v. Stone*, 21 Wyo. 62, 91, 128 P. 612, 619 (Wyo. 1912), (citing *North American Land & Timber Company v. Watkins*, 109 Fed. 101, 48 CCA 254 (C.C.A.5 1901)). ("It is a general rule that courts of equity will not interfere in questions of corporate management or policy. They are reluctant to undertake the management of private corporations, and, in the absence of fraud, usurpation, or gross negligence and mismanagement equivalent to fraud, they generally refuse to interfere, and allow the majority of the stockholders to rule, leaving dissatisfied stockholders to redress their grievances by ordinary corporate methods.") This principle embodied in *Smith* is known as the business judgment rule. The rule governs the question of whether or not and to what extent the business decisions of a corporate entity should be subject to judicial review.

The business judgment rule is a standard of judicial review for director conduct, not a standard of conduct. The rule presumes that business decisions are made by disinterested and independent directors on an informed basis and with a good faith belief that the decision will serve the best interests of the corporation. If directors are sued with respect to a decision they have made (either in an action by the corporation on its own behalf, by shareholders acting derivatively on behalf of the corporation, by shareholders suing individually on their own behalf or as a class, or by a regulatory body that has assumed control of the corporation and is suing on behalf of the corporation), the court will examine the decision only to the extent necessary to determine whether the plaintiff has alleged and proven facts that overcome the business judgment rule presumption that business decisions are made by disinterested and independent directors on an informed basis and with a good faith belief that the decisions will serve the best interests of the corporation. If the presumption has not been overcome, "then the business judgment rule prohibits the court from going further and examining the merits of the underlying business decision" and "prevent[s] a factfinder, in hindsight, from second-guessing the decisions of directors." ...

. . . .

Thus, where "the board act[s] with due care, good faith, and in the honest belief that they are acting in the best interests of the stockholders ..., the Court gives great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and 'will not substitute [its] views for those of the board if the latter's decision can be 'attributed to any rational business purpose.'" In other words, "[c]ourts give deference to directors' decisions reached by a proper process, and do not apply an objective reasonableness test in such a case to examine the wisdom of the decision itself." A court does not "substitute its own notion

of what is or is not sound business judgment" in place of the board's judgment. Additionally, "[a]pproval of a transaction by a majority of independent, disinterested directors almost always bolsters [the] presumption that the business judgment rule attaches to transactions approved by a board of directors that are later attacked on grounds of lack of due care."

. . . .

In order to state a claim, a shareholder plaintiff has the "heavy burden" of alleging and proving facts—not merely legal conclusions—that overcome the business judgment rule presumption. The business judgment rule presumption thus "is a rule of evidence that places the initial burden of proof on the plaintiff" challenging the board's decision. "If a shareholder plaintiff fails to meet this evidentiary burden, the business judgment rule attaches to protect corporate officers and directors and the decisions they make." "[T]o rebut the presumption, a shareholder plaintiff assumes the burden of providing evidence that the board of directors, in reaching its challenged decision, breached any one of its triad of fiduciary duties: good faith, loyalty or due care." "[I]f the plaintiff fails to rebut the presumption that the directors acted in good faith, in the corporation's best interest and on an informed basis, the business judgment standard protects both the directors and the decisions they make." [Footnotes omitted.]

1 Dennis J. Block, Nancy E. Barton & Stephen A. Radin, The Business Judgment Rule: Fiduciary Duties of Corporate Directors, at 4–5; 21–22; 25–27 (5th ed.1998) (and cases cited therein). "As the name implies, a necessary predicate for the application of the business judgment rule is that the directors' decision be that of a *business* judgment and not a decision . . . which construes and applies a statute and a corporate bylaw." *Lake Monticello Owners' Association v. Lake*, 250 Va. 565, 463 S.E.2d 652, 656 (Va.1995) (emphasis in original); *see also Grimes v. Donald*, 1995 WL 54441 (Del.Ch.), 20 Del. J. Corp. L. 757, 771, (Del.Ch.1995), *affirmed*

673 A.2d 1207 (Del.1996). The business judgment rule is widely recognized: *Michaud v. Morris*, 603 So.2d 886 (Ala.1992); *Shields v. Cape Fox Corporation*, 42 P.3d 1083 (Alaska 2002); *Long v. Lampton*, 324 Ark. 511, 922 S.W.2d 692 (1996); *Lamden v. La Jolla Shores Clubdominium Homeowners Association*, 21 Cal.4th 249, 87 Cal. Rptr.2d 237, 980 P.2d 940 (1999); *Hirsch v. Jones Intercable, Inc.*, 984 P.2d 629 (Colo. 1999); *Rosenfield v. Metals Selling Corporation*, 229 Conn. 771, 643 A.2d 1253 (1994); *McMullin v. Beran*, 765 A.2d 910 (Del.2000); *Leppaluoto v. Warm Springs Hollow Homeowners Association, Inc.* 114 Idaho 3, 752 P.2d 605 (1988); *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227 (Ind.2001); *Whalen v. Connelly*, 593 N.W.2d 147 (Iowa 1999); *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 77 P.3d 130 (2003); *Security Trust Company v. Dabney*, 372 S.W.2d 401 (Ky.1963); *Salley v. Salley*, 661 So.2d 437 (La.1995); *Rosenthal v. Rosenthal*, 543 A.2d 348 (Me. 1988); *Werbowsky v. Collomb*, 362 Md. 581, 766 A.2d 123 (2001); *Harhen v. Brown*, 431 Mass. 838, 730 N.E.2d 859 (2000); *Janssen v. Best & Flanagan*, 662 N.W.2d 876 (Minn. 2003); *Omnibank of Mantee v. United Southern Bank*, 607 So.2d 76 (Miss.1992); *Daniels v. Thomas, Dean & Hoskins, Inc.*, 246 Mont. 125, 804 P.2d 359 (1990); *Sadler v. Jorad, Inc.*, 268 Neb. 60, 680 N.W.2d 165 (2004); *In re PSE & G Shareholder Litigation*, 173 N.J. 258, 801 A.2d 295 (2002); *White ex rel. Banes Company Derivative Action v. Banes Company*, 116 N.M. 611, 866 P.2d 339 (1993); *40 West 67th Street Corporation v. Pullman*, 100 N.Y.2d 147, 760 N.Y.S.2d 745, 790 N.E.2d 1174 (2003); *Riverside Park Condominiums Unit Owners Association v. Lucas*, 691 N.W.2d 862 (N.D. 2005); *Stepak v. Schey*, 51 Ohio St.3d 8, 553 N.E.2d 1072 (1990); *Warren v. Century Bankcorporation, Inc.*, 741 P.2d 846 (Okla. 1987); *Cuker v. Mikalauskas*, 547 Pa. 600, 692 A.2d 1042 (1997); *Mueller v. Cedar Shore Resort, Inc.*, 643 N.W.2d 56 (S.D.2002).

▆▆▆ [¶ 21] The rule is applicable here.[5] Whether a corporation should pursue

5. The Wyoming Nonprofit Corporation Act is "based upon the Revised Model Nonprofit Corporation Act." The official comments to the Re-

vised Model Nonprofit Corporation Act (the Model Act) state that the application of the business judgment rule is "consistent" with the standards

a claim through litigation is a matter for the business judgment of the Board. *See Harhen,* 730 N.E.2d at 865–66; and *Cuker,* 692 A.2d at 1048. The Board's decisions to enter into a settlement agreement with Crittenden was a business judgment.[6] Appellants did not allege or establish any facts supporting a claim that the Board's actions were taken in bad faith or that any of the directors were not disinterested; they only complain that the Board's actions were "unreasonable." Whether or not a particular action by a Board is "reasonable" is not for us to decide—that determination is vested in the discretion of the Board. A court does "not apply an objective reasonableness test in such a case to examine the wisdom of the decision itself." 1 Block, Barton & Radin, *supra,* at 4–5; 21–22; 25–27. Certainly, the Board's decisions here can be "attributed to any rational business purpose" as the Board's own staff recommended in both Zimmer and Crittenden's cases to settle the matters because pursuing collection was not worth the cost of litigation. Appellants have not alleged facts sufficient to rebut the presumption of the business judgment rule that the Board's decisions were taken in good faith with the intent of serving the best interests of the corporation. We will not interfere with business decisions made by directors in good faith in what the directors believe to be in the organization's best interest. The district court's summary judgments on the claims against Zimmer, Crittenden, and the Association's Board are affirmed.

### Ultra vires claim against Zimmer & Crittenden

[¶ 22] The Association's bylaws provide that:

> **Subordinate Officers.** The Board of Directors may appoint and engage under personal service contracts a General Manager and Assistant Manager, and such other officers as the business of the Association may require, each of whom shall hold office for such period, have such authority

and perform such duties as are provided in these By-laws and their personal service contracts, or as the Board of Directors may from time to time determine. Such officers may not be members of the Board of Directors.

By-laws of Star Valley Ranch Association, Article IX Section 3. The Association's Personnel Policies and Procedures also state that: "Because of the need for stability and continuity, the positions of General Manager and Assistant General Manager are further defined and filled through personal service contracts, while other positions are computed on a monthly or hourly basis." The parties agree that neither Zimmer nor Crittenden had a personal services contract during their tenures as general manager. In their complaint, Appellants alleged that the lack of a personal services contract rendered Zimmer and Crittenden's employment "ultra vires." Specific to Crittenden, Appellants allege that his employment was also ultra vires because the Association let him fulfill the duties of general manager while Crittenden remained a director of the Board when they created a "business agent" position in order to circumvent Association bylaws prohibiting a director from serving as general manager. Appellants seek restitution from Zimmer and Crittenden for the salaries paid to them while they served as general manager (or as business agent) on the grounds that they knew, or should have known, the provisions of the bylaws requiring a personal services contract for that position. The district court granted summary judgment without explanation of its reasoning.

[¶ 23] A simple review of our statutes shows that Appellants' claim is utterly devoid of merit. With respect to claims of ultra vires, the Wyoming Nonprofit Corporation Act provides:

**Ultra vires.**

(a) Except as provided in subsection (b) of this section, the validity of corporate

---

6. This analysis is equally applicable to the Board's decision to enter into the release with Zimmer.

of conduct established for directors and that "in the nonprofit context the business judgment rule should apply to discretionary matters voted upon by the board of directors[.]" Revised Model Nonprofit Corporation Act, § 8.30 at 216 (1988).

354

action may not be challenged on the ground that the corporation lacks or lacked power to act.

(b) A corporation's power to act may be challenged in a proceeding against the corporation to enjoin an act where a third party has not acquired rights. The proceeding may be brought by the attorney general, a director or by a member or members in a derivative proceeding.

(c) A corporation's power to act may be challenged in a proceeding against an incumbent or former director, officer, employee or agent of the corporation. The proceeding may be brought by a director, the corporation, directly, derivatively, or through a receiver, a trustee or other legal representative, or in the case of a public benefit corporation, by the attorney general.

Wyo. Stat. Ann. § 17–19–304 (LexisNexis 2005). Since the exception in subsection (b) is plainly not applicable as this is not an action to enjoin any corporate act, Appellants' claims are clearly barred under subsection (a) of the statute. Zimmer and Crittenden have completed their service as general manager:

> When an ultra vires contract has been fully performed on both sides, neither party can maintain an action to set aside the transaction or to recover what has been parted with. In other words, neither a court of law nor a court of equity will interfere to deprive either the corporation or the other party of money or other property acquired under the contract. The reason for the rule, which is well settled, is that the attempted contract, being void, is disregarded, and in its place a quasi-contractual obligation to do justice is enforced. Ultra vires will not justify the reopening of a completely executed transaction. Stated differently, if an ultra vires contract is fully executed on both sides, it cannot be attacked or set aside either by the corporation or by the other party to the contract, and the fact that the contract is ultra vires cannot be collaterally urged by a third person not a party to the contract.

7A Fletcher Cyclopedia Corporations § 3497 (1997).

[¶ 24] Appellants did not cite or discuss Wyo. Stat. Ann. § 17–19–304 in their argument on this issue. The egregiousness of this failure is compounded by the fact that Appellants were obviously aware of the statute because they cite it in support of an argument on another issue. Appellants' argument is not only not cogent, it is frivolous, and we can only conclude that the claim was pursued in bad faith. The summary judgment is affirmed.

***Fraud, negligent misrepresentation and conflict of interest claims against Cox and Cox, Ohman & Brandstetter***

[¶ 25] Cox was elected to the Board in June of 1994. The Association had a policy of reimbursing directors for expenses incurred while in the performance of their duties. The policy was encompassed within the Association's accounting procedures. Cox used the resources of his law firm in performing his duties as a director. He sought reimbursement for the expenses incurred by his law firm. In a letter dated March 28, 1995, to the then general manager of the Association, Joseph Iwanski, Cox referenced an agreement for reimbursement:

> This will confirm our understanding as to the reimbursement to be paid to this office and myself for Director costs and expenses incurred hereafter. We understand that such Director costs and expenses will be reimbursed or paid to us by the Association as follows:
>
> 1. $.10 per page for photocopy cost (regular is $.20 per page);
> 2. $1.00 per page for facsimiles sent;
> 3. Actual postage costs above the regular postal rate for first class letters;
> 4. Actual cost for long distant telephone charges plus 15% to cover bookkeeping, regular service and system maintenance/replacement costs;
> 5. Milage [sic] at the going rate allowed by the IRS for SVRA business travel other that [sic] to the ranch;

6. Airfare, if any, at cost.

If the above does not meet with your and the Associations [sic] understanding and approval, please advise immediately. Otherwise, we will hereafter rely on the foregoing.

The Association paid all invoices submitted by Cox and his firm for expense reimbursement.

[¶ 26] Appellants demanded that the Association seek repayment of the monies paid to Cox and his law firm and when the Board refused, they filed this action. Appellants alleged that Cox had engaged in a conflict of interest transaction without obtaining prior authorization of the Association in violation of Wyoming statute and the Association by-laws. Appellants alleged that the Board's failure to obtain repayment breached its fiduciary duties to the Association and its members. In separate claims against Cox, Appellants alleged that he engaged in fraud and/or negligent misrepresentation when he represented to the Board that Zimmer had settled the claim against him for overpayment of salary with a prior Board. The district court granted Cox's motion for summary judgment finding that since "Cox was not doing business with the Association when he was incurring the expenses [rather] he was acting in furtherance of the Association's business in his capacity as a director," there was no conflict of interest transaction. The court also granted summary judgment on the fraud and negligent misrepresentation claims since the finding that Cox's billings were appropriate precluded them.

[¶ 27] We can quickly dispense with the fraud and negligent misrepresentation claims. Initially, however, we note that the district court erred in its reasoning for granting summary judgment. Appellants' claims for fraud and misrepresentation had nothing to do with Cox's expense billings; rather, they concerned statements made by Cox to the Board with regard to Zimmer's claims for overtime. Nevertheless, after reviewing the record, we conclude that summary judgment was appropriate. As was the case with the claim of fraud against Zimmer, the record does not contain any evidence to support a claim of fraud against Cox. Appel-

lants offer only unsupported allegations regarding Cox's motivations for his statements to the Board. In order to prove negligent misrepresentation, Appellants would have to show that "[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Richey v. Patrick,* 904 P.2d 798, 802 (Wyo. 1995), (quoting Restatement, Second, Torts § 552(1) (1977)). We can locate no evidence in the record to support an allegation that Cox failed "to exercise reasonable care or competence in obtaining or communicating the information" regarding Zimmer's overtime claim to the Board. Again, Appellants offer nothing but allegations in support of their claims. The district court's summary judgment is affirmed.

[¶ 28] Appellants contend that the reimbursement of expenses to Cox and the law firm constituted a conflict of interest transaction that required specific board approval. They argue that there are material facts in dispute regarding whether there was an agreement between Cox and the Board for reimbursement of expenses and whether such was sufficient to satisfy the requirement of Board approval that should have precluded summary judgment.

[¶ 29] We begin with the language of the statute governing director conflicts of interest under the Wyoming Nonprofit Corporation Act:

**Director conflict of interest.**

(a) A conflict of interest transaction is a transaction with the corporation in which a director of the corporation has a direct or indirect interest. A conflict of interest transaction is not voidable if the transaction was fair at the time it was entered into or is approved as provided in subsection (b) or (c) of this section.

(b) A transaction in which a director of a public benefit or religious corporation has a conflict of interest may be approved:

(i) In advance by the vote of the board of directors or a committee of the board if:

(A) The material facts of the transaction and the director's interest are disclosed or known to the board or committee of the board; and

(B) The directors approving the transaction in good faith reasonably believe that the transaction is fair to the corporation; or

(ii) Before or after it is consummated by obtaining approval of the:

(A) Attorney general; or

(B) District court in an action in which the attorney general is joined as a party.

(c) A transaction in which a director of a mutual benefit corporation has a conflict of interest may be approved if:

(i) The material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee of the board and the board or committee of the board authorized, approved or ratified the transaction; or

(ii) The material facts of the transaction and the director's interest were disclosed or known to the members and they authorized, approved or ratified the transaction.

(d) For purposes of this section, a director of the corporation has an indirect interest in a transaction if:

(i) Another entity in which the director has a material interest or in which the director is a general partner is a party to the transaction; or

(ii) Another entity of which the director is a director, officer or trustee is a party to the transaction.

(e) For purposes of subsections (b) and (c) of this section a conflict of interest transaction is authorized, approved or ratified, if it receives the affirmative vote of a majority of the directors on the board or on the committee, who have no direct or indirect interest in the transaction, but a transaction shall not be authorized, approved or ratified under this section by a single director. If a majority of the directors on the board who have no direct or indirect interest in the transaction vote to authorize, approve or ratify the transaction, a quorum is present for the purpose of taking action under this section. The presence of, or a vote cast by, a director with a direct or indirect interest in the transaction does not affect the validity of any action taken under paragraph (b)(i) or (c)(i) or this section if the transaction is otherwise approved as provided in subsection (b) or (c) of this section.

(f) For purposes of paragraph (c)(ii) of this section, a conflict of interest transaction is authorized, approved or ratified by the members if it receives a majority of the votes entitled to be counted under this subsection. Votes cast by or voted under the control of a director who has a direct or indirect interest in the transaction, and votes cast by or voted under the control of an entity described in paragraph (d)(i) of this section, shall not be counted in a vote of members to determine whether to authorize, approve or ratify a conflict of interest transaction under paragraph (c)(ii) of this section. The vote of these members, however, is counted in determining whether the transaction is approved under other sections of this act. A majority of the voting power, whether or not present, that are entitled to be counted in a vote on the transaction under this subsection constitutes a quorum for the purpose of taking action under this section.

(g) The articles, bylaws or a resolution of the board may impose additional requirements on conflict of interest transactions.

Wyo. Stat. Ann. § 17–19–831 (LexisNexis 2005). "We endeavor to interpret statutes in accordance with the Legislature's intent. We begin by making an "'inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection.'" [citation omitted] We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe together all parts of the statute in pari materia." *In re Estate of Novakovich,* 2004 WY 158, ¶ 13, 101 P.3d 931, 934 (Wyo. 2004) (quoting *Wyodak Resources Development Corporation v. State Board of Equalization,* 2001 WY 92, ¶ 7, 32 P.3d 1056, [1058] (Wyo.2001) and *Exxon Corporation v. Board of County Commissioners,* 987 P.2d 158, 161–62 (Wyo.1999)).

[¶ 30] This statute prevents a corporate director of a nonprofit corporation from engaging in activity with the corporation in which the director has a direct or indirect interest unless certain specific procedures are followed by the governing board. The purpose of the statute, obviously, is to protect the corporation from potential unfair dealing by providing for review of conflict of interest transactions by disinterested board or committee members. The Association's bylaws echo the statutory purpose:

No member of the Board of Directors or Officers or member of any committee of the Association shall directly or indirectly benefit financially from or possess an interest in any contract or transaction relating to the property, facilities, or operation of the Association, or the furnishing of supplies, equipment or services to the Association unless specifically authorized by the Board of Directors.

The threshold question then is whether the statute or bylaw is even applicable to this situation. The district court concluded that it was not since Cox was not doing business with the Association; rather, Cox was incurring the expenses while furthering the Association's business in his capacity as a director. We agree.

[¶ 31] The phrase "conflict of interest transaction" is defined by the statute as "a transaction with the corporation in which a director of the corporation has a direct or indirect interest." What constitutes a "transaction" is not defined by the statute or elsewhere in the Wyoming Nonprofit Corporation Act. As previously noted, Wyoming's Nonprofit Corporation Act is based on the Revised Model Nonprofit Corporation Act. While that Model Act and its official comments are silent on what comprises a "transaction," the drafters "decided to track the [Model Business Corporation Act] in form and substance wherever appropriate[.]" Revised Model Nonprofit Corporation Act, Introduction at xx (1988). The substantively similar conflict of interest provision found in the Model Business Corporation Act provides some guidance. In the Introductory Comments to that Act a definition of what constitutes a "transaction" for conflict of interest analysis is found:

[T]he subchapter is applicable only when there is a "transaction" by or with the corporation. For purposes of subchapter F, "transaction" generally connotes negotiations or a consensual bilateral arrangement between the corporation and another party or parties that concern their respective and differing economic rights or interests—not simply a unilateral action by the corporation but rather a "deal."

2 Model Business Corporation Act Annotated § 8.60, at 8–373 (3rd ed.1998). The official comment to the Model Act goes on to state:

To constitute a director's conflicting interest transaction, there must first be a transaction by the corporation, its subsidiary, or controlled entity in which the director has a financial interest. As discussed earlier, the safe harbor provisions provided by subchapter F have no application to circumstances in which there is no "transaction" by the corporation, however apparent the director's conflicting interest. Other strictures of law prohibit a director from seizing corporate opportunities for himself and from competing against the corporation of which he is a director; subchapter F has no application to such situations. Moreover, a director might personally benefit if the corporation takes no action, as where the corporation decides not to make a bid. Subchapter F has no application to such instances. The limited

thrust of the subchapter is to establish procedures which, if followed, immunize a corporate transaction and the interested director against the common law doctrine of voidability grounded on the director's conflicting interest.

*Id.* § 8.60, at 8–382–83 (1997 Supplement). The Model Act's definition of "transaction" is consistent with the plain meaning of the word:

1. The act or an instance of conducting business or other dealings. 2. Something performed or carried out; a business agreement or exchange. 3. Any activity involving two or more persons. 4. *Civil law.* An agreement that is intended by the parties to prevent or end a dispute and in which they make reciprocal concessions.

Black's Law Dictionary 1503 (7th ed.1999).

[¶ 32] There is no "transaction," as that term is used in the statute, in this case. The reimbursement of a director's expenses incurred while in the performance of his or her duties is not the type of corporate action the statute was designed to cover. There were no "negotiations or a consensual bilateral arrangement between the corporation and another party." There is no "deal" or act or agreement here. The Board made a decision to reimburse directors for the expenses they incurred while in the performance of their duties. That is a policy choice. Indeed, Appellants do not challenge the Board's authority to reimburse director expenses. Appellant Mueller acknowledged in his deposition that the Association had a long-standing practice of reimbursement and that Cox would be entitled to reimbursement for any reasonable expenses. Appellants' complaint is apparently predicated on the Board's decision to reimburse Cox and his law firm for overhead on telephone expenses. Appellants fail to articulate why that action would render the reimbursements to Cox and the law firm a conflict of interest transaction under the statute. The Board's decision was a policy choice within its discretion and authority, one that, as already noted, we will not disturb absent a showing of bad faith. Appellants have sought to expand the reach of Wyo. Stat. Ann. § 17–19–831 far beyond the scope of its plain language and the purpose behind the statute. The summary judgment on this claim is affirmed.

### *Declaratory judgment claim against the Association*

[¶ 33] On June 24, 1995, the Association's annual election of directors was held. On the ballot was a proposed amendment to the bylaws to increase the number of directors from five to seven. The Association bylaws provided that membership was appurtenant to the subdivision lots, with each lot entitled to one vote. At the time of the election, there were 2,027 lots, or votes, in the Association. The bylaws contained the following provisions relevant to amendments to change the number of directors:

#### Article VIII

#### Directors

**Section 2. Number and Qualifications of Directors.** The Board of Directors shall consist of the number of Directors named in the Articles of Incorporation (5) until changed by amendment of the Articles, or by amendment to this Section 2 of these By-laws, fixing or changing such number, adopted by a majority of the voting power; but in no event shall there be less than three (3) Directors. All Directors shall be voting members in good standing of the Association.

\* \* \*

#### Article XI

#### Amendments

**Section 1. Powers of Members.** The By-laws of this Association may be adopted, amended, or repealed at a meeting duly called for said purpose by an affirmative vote of at least two thirds (2/3) majority of the voting powers of those present or by proxy. The presence in person or by proxy of fifty percent (50) of all members authorized to vote shall constitute a quorum for the purpose of amending or repealing the By-laws. Any proposed amendment or repeal as provided above shall be submitted in writing to each

member of the Association thirty (30) days in advance of said meeting.

**Section 2. Powers of Directors.** Subject to the right of the members to adopt, amend or repeal these By-laws, as provided in [the Powers of Members section above], at any special or regular meeting, the Board of Directors may adopt, amend, or repeal any of these By-laws other than a By-law or amendment thereof changing the authorized number of Directors.

There were 1,042 votes present in person or by proxy at the election meeting. No official statement or record of the vote was released but the contemporaneous notes of director Cox reflected 753 votes in favor and 126 opposed to the amendment. The amendment went into effect in 1996 and a seven-member board has served every year since.

[¶ 34] Appellants filed a declaratory judgment action seeking to set aside the amendment to the bylaws. The district court granted summary judgment, determining that since a quorum was present and the amendment received two-thirds of the votes present at the meeting, the amendment was effective under Article XI, Section 1, of the bylaws.

[¶ 35] Bylaws are contractual in nature. *Skane v. Star Valley Ranch Association*, 826 P.2d 266, 271 (Wyo.1992). Unsurprisingly, bylaws are interpreted according to the principles applicable to the interpretation of contracts. *Bloom v. National Collegiate Athletic Association*, 93 P.3d 621, 625 (Colo.App.2004); *Singh v. Singh*, 114 Cal. App.4th 1264, 1293–94, 9 Cal.Rptr.3d 4 (Cal. App.2004); *Dawkins v. Walker*, 794 So.2d 333, 339 (Ala.2001). Our standard for interpreting contracts is well-established and straightforward:

> In contract litigation, when the terms of the agreement are unambiguous, the interpretation is a question of law. . . . *Examination Management Services, Inc. v. Kirschbaum*, 927 P.2d 686, 689 (Wyo.1996); *Union Pacific Resources Co. v. Texaco, Inc.*, 882 P.2d 212, 218–19 (Wyo.1994). Whether a contract is ambiguous is a question of law for the reviewing court. *Prudential Preferred Properties v. J and J Ventures, Inc.*, 859 P.2d 1267, 1271 (Wyo.

1993). We review questions of law de novo without affording deference to the decision of the district court. *Hermreck v. United Parcel Service, Inc.*, 938 P.2d 863, 866 (Wyo.1997); *Griess v. Office of the Atty. Gen., Div. of Criminal Investigation*, 932 P.2d 734, 736 (Wyo.1997).

> According to our established standards for interpretation of contracts, the words used in the contract are afforded the plain meaning that a reasonable person would give them. *Doctors' Co. v. Insurance Corp. of America*, 864 P.2d 1018, 1023 (Wyo.1993). When the provisions in the contract are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties. *Union Pacific Resources Co.*, 882 P.2d at 220; *Prudential Preferred Properties*, 859 P.2d at 1271. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate. *Sinclair Oil Corp. v. Republic Ins. Co.*, 929 P.2d 535, 539 (Wyo.1996); *Prudential Preferred Properties*, 859 P.2d at 1271.

*Roney v. B.B.C. Corporation*, 2004 WY 113, ¶ 10, 98 P.3d 196, 200 (Wyo.2004) (quoting *Amoco Prod. Co. v. EM Nominee Partnership Co.*, 2 P.3d 534, 540 (Wyo.2000) and *Double Eagle Petroleum & Min. Corp. v. Questar Exploration & Prod. Co.*, 2003 WY 139, ¶ 7, 78 P.3d 679, [681] (Wyo.2003)).

[¶ 36] The parties advance two alternative interpretations of the Association's bylaws. Appellants interpret the phrase "voting power" in Article VIII, Section 2, to require a different approval procedure for amendments concerning the number of directors than that set out in the general provision for amending bylaws in Article XI, Section 1. They point out that the phrase is defined in Wyoming's Nonprofit Corporation Act to mean "the total number of votes entitled to be cast for the election of directors at the time the determination of voting power is made[.]" Wyo. Stat. Ann. § 17–19–140(a)(xxxvi) (LexisNexis 2005). Appellants read Article VIII, Section 2, to require a majority vote of all eligible voters in the Association to amend the bylaw and change the number of directors. Accordingly, they

conclude that 1,014 votes out of the 2,027 total were necessary to pass the amendment and since it received only 753 votes, it failed.

[¶ 37] The Association argues, and the district court agreed, that an amendment to change the number of directors needs, if a quorum is present, two-thirds of the majority of the votes present at the election meeting as set forth in Article XI, Section 1, of the bylaws. The Association interprets the phrase "voting power" appearing in Article VIII, Section 2, to refer to the total number of votes entitled to be cast in an election of directors at the time of voting. After noting that Wyo. Stat. Ann. § 17–19–707(b) [7] grants nonprofit corporations broad discretion in defining in their bylaws the members entitled to vote, the Association concludes that Article XI, Section 1, defines those members who are entitled to vote as those who are present in person or by proxy at the election. Accordingly, the Association concludes that the amendment was passed pursuant to the bylaws as more than two-thirds of the votes present were in favor.

[¶ 38] We agree with the Association. The Model Business Corporation Act further defines "voting power" to mean ". . . the current power to vote in the election of directors. Application of this definition turns on whether the relevant shares carry the power to vote in the election of directors *as of the time for voting on the relevant transaction*." 1 Model Business Corporation Act Annotated § 1.40 at 1–87 (emphasis added) (3rd ed. 1998 2000/01/02 Supplement). The Association is given the discretion by statute to determine "the members entitled to vote at a members' meeting." Article XI, Section 1, unambiguously states that the "voting power" consists of those members "present or by proxy." Members who do not appear or provide a proxy are not eligible to vote in the Association's elections to amend bylaws. Appellants' interpretation circumvents the bylaw requirements for voting eligibility by giving a vote—which will always be a "no" vote—to every lot owner who fails to appear at the meeting. Appellants' position would make it virtually impossible to amend the bylaw, and it effectively deprives the members who complied with bylaw requirements and appeared at the meeting in person or by proxy of their vote. We agree with the district court that the Association's interpretation of the bylaws is the correct one.

[¶ 39] In granting summary judgment, the district court declined to consider an affidavit proffered by Appellants from a member of the Association who claimed to have been present during the vote and count. Sara Kittleson averred that the results of the election were posted on a chalkboard and showed that the amendment only received 653 votes. Attached to the affidavit was a handwritten note made at the time by Kittleson reflecting what was written on the chalkboard. Since 653 votes do not constitute a two-thirds majority of the votes present, Appellants contend that this was evidence that the amendment did not pass. The district court rejected the proffered affidavit concluding that it was hearsay and unreliable. Appellants contend that the district court's conclusion was in error.

[¶ 40] The determination of admissibility of evidence is vested in the district court's discretion. *Armstrong v. Hrabal*, 2004 WY 39, ¶ 10, 87 P.3d 1226, 1230 (Wyo. 2004). After a movant has adequately supported a motion for summary judgment, the opposing party must come forward with competent evidence admissible at trial showing that there are genuine issues of material fact. *Jones v. Schabron*, 2005 WY 65, ¶ 9, 113 P.3d 34, 37 (Wyo.2005).

[¶ 41] Hearsay, of course, "is a statement, other than one made by the declarant while testifying at the trial or hear-

7. The statute provides:

§ 17–19–707. **Record date; determining members entitled to notice and vote.**

. . . .

(b) The bylaws of a corporation may fix or provide the manner of fixing a date as the record date for determining the members enti-tled to vote at a members' meeting. If the bylaws do not fix or provide for fixing a record date, the board may fix a future date as the record date. If no record date is fixed, members on the date of the meeting who are otherwise eligible to vote are entitled to vote at the meeting.

ing, offered in evidence to prove the truth of the matter asserted." W.R.E. 801(c) (Lexis-Nexis 2005). A "statement" is "an oral or written assertion or ... nonverbal conduct of a person, if it is intended by him as an assertion." W.R.E. 801(a). Appellants assert that Kittleson's affidavit was not hearsay. It was "what she saw." Appellants do not support their argument with any analysis or citation to legal authority. We conclude that the district court was correct and that Kittleson's affidavit is hearsay. Kittleson's affidavit (and attached note) describes a writing produced by another person, and it is being offered for the truth of the matter asserted therein (i.e., that there were, in fact, a certain number of votes). There is no evidence that Kittleson has any personal knowledge of the facts set forth on the chalkboard. It is basic evidence law that "[a]ny writing, other than one made by a witness during the witness's testimony in court, is hearsay if offered to prove the truth of what is written." David F. Binder, Hearsay Handbook § 1:4 (4th ed.2001); *see,* e.g., *Odegard v. Odegard,* 2003 WY 67, ¶ 14–15, 69 P.3d 917, 922–23 (Wyo.2003) (letter is hearsay); *Canyon View Ranch v. Basin Electric Power Corporation,* 628 P.2d 530, 537 (Wyo. 1981) (facts in magazine article without any evidence to establish their truth or credibility are hearsay); and *City of Cheyenne v. Frangos,* 487 P.2d 804, 807 (Wyo.1971) (newspaper article is hearsay). Given that Appellants have not made an argument that any of the exceptions to the hearsay rule apply, or otherwise present us a cogent argument, we need not consider this claim any further.

[¶ 42] Finally, Appellants contend that the amendment is void because of the Association's failure to maintain a record of the vote in its minutes or permanent records and to record the amendment in the bylaws. The Association's bylaws state that:

**Section 3. Record of Amendments.** Whenever an amendment or new By-law is adopted, it shall be placed in the book of By-laws in the appropriate place. If any By-law is repealed, the fact of repeal, with the date of the meeting at which the repeal was enacted or written assent was filed, shall be stated in said book.

By–Laws of Star Valley Ranch Association, Article XI, Section 3. The copy of the bylaws we have in the record contains a footnote in Article VIII, Section 2, that governs the number of directors indicating that the bylaw was amended on June 24, 1995. That date, of course, is when the subject disputed election was held. Appellants do not mention this fact in their brief. Without a cogent argument as to why this reference is not sufficient notice of the amendment under the Association's bylaws, we will not consider the matter further.

■ [¶ 43] Appellants' argument that the Association's failure to maintain a record of the election renders the amendment void is predicated on Wyo. Stat. Ann. § 17–19–1601(a) (LexisNexis 2005), which provides:

A corporation shall keep as permanent records minutes of all meetings of its members and board of directors, a record of all actions taken by the members or directors without a meeting, and a record of all actions taken by committees of the board of directors as authorized by W.S. 17–19–825(d).

Appellants contend that the failure of a corporation to maintain proper records as mandated by statute "affects the validity of the action" taken. There is no dispute that there is no official record of the vote on the amendment in the Association's records. However, Appellants fail to cite any legal authority for the proposition that such failure automatically renders the action invalid. There is authority that suggests this is not so. *See Swain v. Wiley College,* 74 S.W.3d 143, 147 (Tex.App.2002) ("The failure of a corporation to record the actions of its directors in corporate minutes, as required by its bylaws and the Texas Non Profit Corporation Act, does not render the action invalid."); and *Wimbledon Townhouse Condominium I, Association, Inc. v. Wolfson,* 510 So.2d 1106, 1108–09 (Fla.App. 4 Dist.1987) ("Failure of the board of directors of a corporation to record their action will not affect the validity of the acts done by them.") (quoting *Redstone v. Redstone Lumber & Supply Co.,* 101 Fla. 226, 133 So. 882, 883–84 (1931)). When a corporation's minutes do not fully reflect an action

taken by a corporation, parol evidence may be admissible to establish what transpired:

> Where the minutes contain a record of action taken, it will be presumed, prima facie, that the record covers the entire action. This is not conclusive, however, and parol evidence may be introduced to show what was in fact done. If the minutes appear on their face or are shown to be incomplete or incorrect or otherwise fail to show what actually transpired, parol evidence is admissible to supply the omission and to aid, correct and supplement them, or to aid in ascertaining the true meaning of indefinite or ambiguous records. Thus, where the corporate minutes are incomplete but are sufficient to show that the shareholders and directors present at a meeting did enter into an agreement, the courts may resort to evidence of extrinsic facts and circumstances to determine the full intent of the agreement if any ambiguity arises.

5A Fletcher Cyclopedia Corporations § 2198 at 178–80 (2004). Here, there is evidence that the amendment passed on a vote of 753 to 126 in director Cox's contemporaneous, handwritten notes. Once again, Appellants fail to provide any legal analysis or cite any authority for their argument. Therefore, we decline to consider their claim. The district court's summary judgment on the declaratory judgment is affirmed.

### Attorney Fees

[¶ 44] In the event that the trial court's summary judgment was affirmed in their favor, Cox and the Association request that we remand to the district court for the determination of attorney fees, costs, and expenses pursuant to Wyo. Stat. Ann. § 17–19–630(d) (LexisNexis 2005) relating to derivative suits:

> On termination of the proceeding the court may require the complainants to pay any defendant's reasonable expenses, including counsel fees, incurred in defending the suit if it finds that the proceeding was commenced frivolously or in bad faith.

Appellants' argument has been characterized by the failure to provide evidence in support of their allegations and by the repeated presentation of contentions that are not cogent or supported by citation to any relevant legal authority. We specifically have found that Appellants' claim that the employments of Zimmer and Crittenden were ultra vires was frivolous and brought in bad faith considering their failure to cite the relevant statutory provision. Accordingly, we will require Appellants to pay all of the defendants' reasonable expenses, including counsel fees incurred in defending that particular claim.[8] While tempted to award fees and costs for the other derivative claims brought by Appellants, we decline to do so after careful consideration of the matter. We remand this matter to the district court for a determination of those fees and costs.

### CONCLUSION

[¶ 45] The district court's summary judgments on Appellants' derivative and declaratory judgment claims are affirmed. The cases are remanded to the district court for a determination of costs and fees owed to defendants by Appellants for their frivolous and bad faith claims in their derivative action.

---

8. Since we are imposing these fees and costs under the derivative statute, any costs or fees incurred by the defendants in defending the declaratory judgment action are not recoverable.